CHAD A. READLER
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director, District Court Section
TIMOTHY M. BELSAN
Senior Litigation Counsel
ARAM A. GAVOOR
Senior Litigation Counsel
TROY D. LIGGETT
Trial Attorney
District Court Section
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4765; (202) 305-7000 (fax)
troy.liggett@usdoj.gov
JOSEPH F. CARILLI, JR.
Trial Attorney
JULIAN M. KURZ
Trial Attorney

*Attorneys for Respondents*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| NAK KIM CHHOEUN, et al., | Case No. 8:17-cv-01898-CJC (GJSx) |
| Petitioners, | **RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE** |
| v. | |
| DAVID MARIN, Field Office Director, Los Angeles Field Office, United States Immigration and Customs Enforcement; et al., | |
| Respondents. | |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................ 1

II.   BACKGROUND AND PROCEDURAL HISTORY ............................... 2

    A. Petitioners' Claims ............................................................ 2

    B. Petitioners Chhoeun and Neth ............................................ 3

    C. U.S. Government Efforts to Repatriate Aliens to Cambodia ......... 4

    D. Fall 2017 Interviews by Cambodian Officials ........................ 6

III.  PRELIMINARY INJUNCTION LEGAL STANDARD ........................... 8

IV.   ARGUMENT ............................................................................ 8

    A. Petitioners Are Not Likely to Succeed on the Merits ............... 8

        1. The Court Lacks Jurisdiction Over Count Five ................. 9

            a. Section 1252 Strips the Court of Jurisdiction Over Count Five.. 9

            b. As Applied, § 1252 Does Not Violate the Suspension Clause ... 12

            c. The *Hamama* Court Erred in Failing to Distinguish Between Motions to Reopen and Motions to Stay ................... 13

        2. Even If § 1252 Did Not Apply, Petitioners Would Be Unlikely to Prevail on Count Five ...................................................... 15

            a. Petitoners Have Received Constitutionally Sufficient Process .. 15

            b. Petitioners Fail to Show that They Would Suffer Prejudice in the Absence of a Last-Minute Opportunity to Challenge Their Removal Orders ................................................ 18

    B. Petitoners Fail to Demonstrate Irreparable Harm ................. 19

    C. The Balance of Equities and the Public Interest Favor Respondents ................................................................ 23

V.    CONCLUSION .......................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Arab Anti-Discrimination Comm. v. Reno*,
   70 F.3d 1045 (9th Cir. 1995)................................................................16

*Arizona Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014)..............................................................21

*Armstrong v. Manzo*,
   380 U.S. 545 (1965) ...................................................................... 15, 16

*Barahona-Gomez v. Reno*,
   167 F.3d 1228 (9th Cir. 1999)..............................................................23

*Boumediene v. Bush*,
   553 U.S. 723 (2008) ............................................................................12

*Caplan v. Fellheimer Eichen Braverman & Kaskey*,
   68 F.3d 828 (3d Cir. 1995)..................................................................20

*Caribbean Marine Servs. Co.*,
   844 F.2d 668 (9th Cir. 1988)......................................................... 21, 23

*Chin v. Sessions*,
   No. 17-1401 (4th Cir. Mar. 29, 2017) ...............................................7, 22

*Coalition for Economic Equity v. Wilson*,
   122 F.3d 718 (9th Cir. 1997)...............................................................25

*Diouf v. Napolitano*,
   634 F.3d 1081 (9th Cir. 2011)..............................................................16

*Flores v. Johnson*,
   No. 2:15-cv-7167, 2015 WL 12656240 (C.D. Cal. Sept. 30, 2015) ....................11

*Hamama v. Adducci*,
   261 F. Supp. 3d 820 (E.D. Mich. 2017) ................................... 9, passim

*Hamama v. Adducci*,
  No. 17-CV-11910, 2017 WL 2684477 (E.D. Mich. June 22, 2017) ...................13

*INS v. Legalization Assistance Project*,
  510 U.S. 1301 (1993) ...........................................................................25

*J.E.F.M. v. Lynch*,
  837 F.3d 1026 (9th Cir. 2016)...................................................... 10, 11

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
  634 F.2d 1197 (9th Cir. 1980)..................................................................23

*Maksoudian v. Gonzales*,
  171 F. App'x 167 (9th Cir. 2006)..............................................................16

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ...........................................................................15

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) .............................................................................8

*Munaf v. Geren*,
  553 U.S. 674 (2008) .............................................................................8

*N.D. v. Haw. Dep't of Educ.*,
  600 F.3d 1180 (9th Cir. 2010)..................................................................23

*Nken v. Holder*,
  556 U.S. 418 (2009). ............................................................ 7, passim

*Padilla v. Ashcroft*,
  334 F.3d 921 (9th Cir. 2003).......................................................... 18, 19

*Perreira v. Faraquharson*,
  No. 3:02-cv-769, 2002 WL 31094957 (D. Conn. Aug. 15, 2002).......................17

*Puri v. Gonzales*,
  464 F.3d 1038 (9th Cir. 2006)...............................................................9, 11

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
  525 U.S. 471 (1999) .............................................................. 9, 10, 11

iv

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Sierra Forest Legacy v. Rey*,
  577 F.3d 1015 (9th Cir. 2009)........................................................................8

*Singh v. Mukasey*,
  533 F.3d 1103 (9th Cir. 2008)......................................................................12

*Small v. Avanti Health Systems, LLC*,
  661 F.3d 1180 (9th Cir. 2011)......................................................................23

*Socop-Gonzalez v. I.N.S.*,
  272 F.3d 1176 (9th Cir. 2001)......................................................................18

*Swain v. Pressley*,
  430 U.S. 372 (1977) ....................................................................................12

*Towery v. Brewer*,
  672 F.3d 650 (9th Cir. 2012).........................................................................8

*United States v. Cupa-Guillen*,
  34 F.3d 860 (9th Cir. 1994)..........................................................................25

*United States v. Hernandez-Guerrero*,
  147 F.3d 1075 (9th Cir. 1998)......................................................................25

*United States v. Thuong*,
  No. 12-cr-10177-EFM (D. Kan. Jan. 23, 2013) ...........................................7

*Ventura Cty. Christian High Sch. v. City of San Buenaventura*,
  233 F. Supp. 2d 1241 (C.D. Cal. 2002)........................................................20

*Winter v. Nat'l Res. Def. Council*,
  555 U.S. 7 (2008) .....................................................................................8, 23

## ADMINISTRATIVE DECISIONS

*In re Juan Beltran Ortiz*,
  2016 WL 3924042 (BIA June 6, 2016)..........................................................19

*Matter of X-G-W-,*
   22 I&N Dec. 71 (BIA 1998)...........................................................................19

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I § 9, cl. 2...........................................................................12

## STATUTES

6 U.S.C. § 251(2) ...........................................................................................9

6 U.S.C. § 557 ................................................................................................9

8 U.S.C. § 1103 ............................................................................................12

8 U.S.C. § 1105a ..........................................................................................10

8 U.S.C. § 1227(a)(2) .....................................................................................4

8 U.S.C. § 1229a(c)(7) ....................................................................... 16, 17, 18

8 U.S.C. § 1231(a) ..........................................................................................5

8 U.S.C. § 1252 ........................................................................................9, 13

8 U.S.C. § 1252(a)(5) ............................................................................. 10, 11

8 U.S.C. § 1252(b)(3)(B) ..............................................................................17

8 U.S.C. § 1252(b)(9)...........................................................................9, 10, 11

8 U.S.C. § 1252(g) ...............................................................................9, 10, 11

Pub. L. No. 107-296.......................................................................................3

vi

# REGULATIONS

8 C.F.R. § 241.13(i)(2)...............................................................................6

8 C.F.R. §1003.2(c) .............................................................. 13, 14, 17

8 C.F.R. § 1003.2(c)(2) .................................................... 16, 18

8 C.F.R. § 1003.2(c)(3) ...........................................................18

8 C.F.R. § 1003.2(f) ............................................ 12, passim

8 C.F.R. § 1003.2(g) ...............................................................14

8 C.F.R. § 1003.6 .............................................. 12, 14, 17

8 C.F.R. § 1003.6(b) ..........................................................12, 17

8 C.F.R. § 1003.23(b)(1)........................................12, 14, 16, 17

8 C.F.R. § 1003.23(b)(3) .................................................14, 17

# AGENCY MANUALS

Board of Immigration Appeals Practice Manual § 6.3 ..........................................14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   INTRODUCTION

Petitioners, a putative class of 1,900 Cambodians, ask this Court to impinge on the Executive Branch's lawful authority to remove dangerous, criminal aliens from the United States.[1]  Petitioners seek eleventh-hour stays of the lawful execution of their final removal orders, even though they have not followed the proper administrative process.  Rather than follow that process, Petitioners ask the Court to recognize a novel and inappropriate procedural due process right to an additional opportunity to seek relief from removal.  But the Court lacks jurisdiction to enter a stay, and doing so would impede U.S. Immigration and Customs Enforcement ("ICE")'s ability to execute the Immigration and Nationality Act ("INA").  The court should decline Petitioners' invitation to upend the comprehensive immigration scheme created by Congress.

Even if the Court reaches the merits of Petitioners' claim, it should not enter a preliminary injunction.  Petitioners' allegations of unlawful removal are unavailing because Petitioners have exhausted or failed to exhaust their administrative and judicial remedies in removal proceedings.  Some Petitioners have recently filed administrative motions to reopen, while others unjustifiably delayed in pursuing post-removal-order avenues of relief.  No Petitioner has plausibly demonstrated irreparable harm because Petitioners' harms, if any, are self-inflicted and thus cannot form the basis for injunctive relief.  Moreover, Petitioners' alleged harms either are no different than the burdens that aliens normally bear when ICE executes removal orders, or, for a vast majority of the putative class, are entirely speculative.

---

[1] "Petitioners" refers to named petitioners Nak Kim Chhoeun and Money Neth, and the members of the putative class as defined in the first amended complaint.  *See* Appl. for Temporary Restraining Order ("TRO") at 1 n.1. ECF No. 28 (Dec. 12, 2017).  To date, 18 individuals have filed motions to withdraw from this action. Motions to Withdraw, ECF Nos. 42–59 (Jan. 8, 2018).

1

Petitioners' request for an eleventh-hour stay is a glaring attempt to disrupt the removal system that Congress has crafted.  ICE's ability to repatriate aliens who are subject to final removal orders—once they have exhausted all administrative and judicial remedies—is essential to the efficient operation of the immigration system.  The Court should deny preliminary injunctive relief.

## II.    BACKGROUND AND PROCEDURAL HISTORY

### A.  Petitioners' Claims

Petitioners are subject to final removal orders and were released from detention until they could be removed to Cambodia.  Petitioners challenge their revocation-of-release, detention, and removal on five grounds, but seek preliminary injunctive relief only as to their procedural due process claim, *see* Appl. for TRO at 23,[2] that if ICE removed them without affording them "sufficient time . . . to file motions to reopen their removal orders," ICE would violate the Due Process Clause.  Am Compl. ¶¶ 76–79 (Count Five).[3]

As to the facts of the Amended Complaint, Petitioners Nak Kim Chhoeun and Mony Neth are two of 113 Cambodian nationals with final removal orders who were lawfully detained and transferred to a central reference location so that Cambodian government officials could interview them and determine whether they

---

[2] Citations to Petitioners' Application for a Temporary Restraining Order, ECF No. 28, cite page numbers of the electronic filing and not page numbers of the multiple documents in the filing.

[3] Petitioners do not seek preliminary injunctive relief on their remaining four claims.  The remaining Counts allege that Petitioners' detention is unlawful because no changed circumstances warranted the revocation of their release, Am. Compl. ¶¶ 53-57 (Count One); that ICE did not notify them of the reasons why the government revoked their release, *id.* ¶¶ 58-63 (Count Two); that there is no significant likelihood of their removal in the reasonably foreseeable future, *id.* ¶¶ 64-71 (Count Three); and that their detention is unlawful because they have not received individualized bond hearings, *id.* ¶¶ 72-75 (Count Four).

were eligible for travel documents.  Decl. of Deputy Asst. Dir. John A. Schultz, Jr. (Jan. 10, 2018) ("Schultz Decl. II") ¶¶ 14-15, 17, Ex. A.  Petitioners ask the Court to enter a preliminary injunction "to give class members a meaningful opportunity to halt their removal based on fundamental changes in the law and their personal circumstances."  Appl. for TRO at 23.  They assert that the Court should now stay their removals after "[t]heir removal orders laid dormant for years, if not a decade or more," because "[t]he Government is moving so quickly that, even if Petitioners could have secured counsel on the first day" of their re-detention, they would have been unable to obtain the documents that they need to raise their claims.  *Id.* at 15.

Petitioners request that the Court stay their removal for sixty days, until February 5, 2018, to "afford [them] . . . an opportunity to secure counsel and pursue meritorious defenses to removal in immigration court."[4]  *Id.* at 1.  On December 14, 2017, the Court granted a temporary stay of removal until January 11, 2018, ECF No. 32, and on stipulation of the parties, extended the stay until a hearing on the matter scheduled for January 25, 2018, ECF No. 37.

## B.  Petitioners Chhoeun and Neth[5]

In 2001, as a result of a state felony criminal conviction, the former Immigration and Naturalization Service ("INS")[6] placed Chhoeun in removal

---

[4] Petitioners asked that the Court stay their removal until the earlier of February 5, 2018, or 30 days from the date Respondents provide a copy of each putative class members' alien registration file or record of proceedings to Petitioners or their counsel.  Appl. TRO at 1.  The second prong is now moot as Respondents did not provide the copies that would have triggered an earlier deadline.

[5] A detailed account of Petitioner Chhouen's and Neth's criminal and immigration history is recounted in Respondents' Memo. of Points and Auth. in Opposition to Petitioners' Appl. for a Temporary Restraining Order, ¶¶ II.B, C.

[6] The INS was abolished as a result of the enactment of the Homeland Security Act of 2002.  *See* §§ 441 and 471 of the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002).  ICE is now the immigration agency within the Department of Homeland Security ("DHS") responsible for the removal of removable aliens.

proceedings, charging him with removability under 8 U.S.C. §§ 1227(a)(2)(A)(iii) (aggravated felony) and 1227(a)(2)(C) (possession of a dangerous firearm).  Decl. of Deputy Asst. Dir. John A. Shultz, Jr. (Dec. 14, 2017) ("Schultz Decl. I") ¶ 22, ECF No. 33-2.  Chhoeun applied in immigration court for relief from removal.  *See* Removal Order and Decision, Ex. B.  In October 2002, an immigration judge found Chhoeun removable for having been convicted of an aggravated felony.  *Id.*; Schultz Decl. I ¶ 23.  In December 2002, the immigration judge denied Chhoeun's applications for relief from removal, and ordered that Chhoeun be removed to Cambodia.  Ex. B; Schultz Decl. I ¶ 24.  In May 2003, the Board of Immigration Appeals ("Board") dismissed an appeal by Chhoeun, rendering his removal order administratively final.  Schultz Decl. I ¶ 25.  Chhoeun did not file a petition for review with a court of appeals.  To date, Chhoeun has not filed a motion to reopen or motion to stay with the immigration court.

In May 1997, as a result of a state felony criminal conviction, INS placed Neth in removal proceedings.  *Id.* ¶ 34.  In March 1999, an immigration judge found Neth removable as charged.  *Id.* ¶ 36.  Neth applied in immigration court for relief from removal.  *See* Removal Order and Decision; Ex. C.  In July 2003, an immigration judge pretermitted Neth's applications for relief from removal and ordered him removed to Cambodia.  *Id.*; Schultz Decl. I ¶ 37.  Ultimately, Neth filed a petition for review, which the Ninth Circuit denied in part, finding that the Board had not abused its discretion, and dismissed Neth's remaining claims, rendering Neth's removal order administratively final.  *See* Neth v. Holder, 344 Fed. App'x 409 (9th Cir. 2009).

On December 13, 2017, Neth filed a motion to reopen his removal proceedings and a motion to stay his removal with the Board.  Motion to Reopen, ECF No. 33-5; Emergency Motion to Stay Removal, ECF No. 33-6.  On December 15, 2017, the Board granted Petitioner Neth's motion to stay his removal during the pendency of his motion to reopen.  Schultz Decl. II ¶ 19.  On December 22,

2017, ICE released Neth on an order of supervision pending the outcome of removal proceedings.  *Id.*

### C.  U.S. Government Efforts to Repatriate Aliens to Cambodia

Since 2002, the United States has consistently repatriated Cambodian nationals with final orders of removal under a 2002 agreement between the United States and Cambodia (hereinafter "2002 MOU"), which calls for each government to designate a "central authority" for the receipt and initial screening of repatriation requests and "related matters."[7]  2002 MOU at 1, ECF No. 33-7  The MOU provides that, upon receiving and reviewing a repatriation request, the central authority of the receiving state may request the "assistance and resources" of the sending state in "conducting any additional interview of the individual and verifying any information contained in the request."  *Id.*  The MOU further prescribes that the receiving state should respond in writing to the sending state no later than 30 days after receiving a request, unless otherwise agreed upon, and issue a travel document, valid for at least sixty days, at the time that it grants a request.  *Id.*  Since entering the MOU, the United States and Cambodian governments have cooperated to remove and repatriate approximately 807 Cambodian nationals,[8] including 16 in fiscal year ("FY") 2015, 74 in FY2016, and 29 in FY2017.  Schultz Decl. II ¶ 7.

ICE selects an alien for an interview with Cambodian government officials only if there is strong evidence that the alien is a Cambodian national.  *Id.* ¶ 9.

---

[7] Repatriation requests are to include a copy of the final order of removal, documentation supporting identity and biographical history, a record of any criminal violations, and other biometric data.  2002 MOU at 2.

[8] On December 15, 2017, the U.S. and Cambodian governments exchanged a diplomatic note wherein the Cambodian government stated that it would give full consideration to the removal and repatriation of any Cambodian national regardless of whether the national meets the criteria delineated in the 2002 MOU.  Schultz Decl. II ¶ 13.

Some prospective interviewees may already be in ICE custody when interviews are scheduled (e.g., pursuant to the 90-day "removal period" that ensues when an alien is ordered removed).[9]  *See id.* ¶ 15.  Other prospective interviewees, whose removal orders became final further in the past, may be taken back into custody and detained for purposes of the interviews after having been previously released from ICE custody.[10]  *See id.*

### D.  Fall 2017 Interviews by Cambodian Officials

On October 13, 2017, United States and Cambodian officials met in Phnom Penh, Cambodia, and agreed to schedule a date for Cambodian government officials to travel to the United States to conduct interviews.  *Id.* ¶ 14.  Based on the meeting, ICE transferred 24 Cambodians who were already in ICE custody to Louisiana for interviews.  *Id.* ¶ 15.  ICE also revoked the release of 89 other Cambodians, including Petitioners Chhoeun and Neth, who were transferred to Louisiana for the interviews.  *Id.*

On each day of interviews, ICE officials met with the interviewees to notify them that they were detained to facilitate the verification interviews by Cambodian officials.  *Id.* ¶ 16.  ICE officials also explained the interview process and afforded interviewees an opportunity to voice concerns about their detention.  *Id.*

---

[9] *See* 8 U.S.C. § 1231(a)(1)(A)–(B) (stating that, except as otherwise provided in this section, aliens ordered removed shall be removed "within a period of 90 days" known as the removal period, and prescribing that the removal period begins on the latest of (1) the date the order of removal becomes administratively final; (2) the date of the court's final order, in cases where the removal order is judicially reviewed and the court orders a stay of removal; and (3) the date the alien is released from detention or confinement, in cases where the alien is detained or confined (except under an immigration process)).

[10] *See* 8 C.F.R. § 241.13(i)(2) (providing that ICE may revoke an alien's release and return the alien to custody if, on account of changed circumstances, ICE determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future).

Of the 113 Cambodian nationals who were transferred for interviews, Cambodian officials interviewed 95 of them, and to date, Cambodia has issued travel documents for 72 of the 95. *Id*. ¶¶ 17, 18.  The travel documents are valid for 180 days.  *Id*. ¶ 18.  The United States and Cambodian governments are exchanging information on 20 of the remaining 23 individuals in an effort to facilitate the issuance of travel documents.  *Id*.  ICE has determined that two of the remaining three individuals are nationals of other countries, and is attempting to arrange their removal to those countries.  *Id*.  The third individual is of unknown nationality, and has been released on an order of supervision.  *Id*.  ICE also released on orders of supervision the 18 Cambodian nationals who were transferred to Louisiana but not interviewed by Cambodian officials.  *Id*. ¶ 17.

As of January 11, 2018, the 113 aliens, since they were originally ordered removed, have filed eleven motions to reopen in immigration courts and five with the Board.[11]  Decl. of Program Analyst Benjamin B. McDowell ("McDowell Decl.") ¶ 6 (Jan. 11, 2018), Ex. F.  Those sixteen motions include the seven immigration-court motions to reopen, and one Board motion to reopen, that have been filed since October 2017.  *Id.*  Of the motions filed since this lawsuit commenced, four were granted, one was denied, and two—including Neth's Board motion—are pending.  *Id.* ¶ 7; ECF No. 33-5.  Administrative stays of removal are in effect in six cases, including Petitioner Neth's.  McDowell Decl. ¶ 7; Schultz Decl. II ¶ 19.  In addition, at least one putative class member has a pending Petition for Review challenging the Board's denial of his motion to reopen.  *See Chin v. Sessions*, No. 17-1401 (4th Cir. Mar. 29, 2017).  The Fourth Circuit has denied

---

[11] Only 112 of the 113 Cambodian nationals were found in EOIR's system that tracks removal proceedings.  McDowell Decl. ¶ 5, n.2.  The individual with alien number -583 is subject to a judicial removal order and, thus, was never ordered removed by an immigration court.  *See* Order of Removal, *United States v. Thuong*, No. 12-cr-10177-01-EFM, ECF No. 28 (D. Kan. Jan. 23, 2013), Ex. G.

three motions to stay this putative class member's removal, including two motions that the putative class member filed after he was detained in October 2017. *See id.*, Order Denying Motion to Stay Removal (4th Cir. Apr. 6, 2017), Ex. H; Order Denying Motion to Stay Removal (4th Cir. Oct. 30, 2017), Ex. I; Order Denying Motion to Stay Removal (4th Cir. Dec. 13, 2017), Ex. J.[12]

## III.  PRELIMINARY INJUNCTION LEGAL STANDARD

A preliminary injunction is "a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  A plaintiff seeking a preliminary injunction "must establish" that: (1) he is likely to succeed on the merits of his claims; (2) he is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008).  Because a "preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 676 (2008) (citations omitted), a party seeking an injunction must present evidence that clearly satisfies the four requirements.  *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012).  When a movant seeks a narrow injunction that implicates only one claim, as Petitioners do here, a court should apply the injunction standard to that one claim.  *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009).

## IV.  ARGUMENT

### A. Petitioners Are Not Likely to Succeed on the Merits.

Petitioners are not likely to succeed on their unlawful-removal claim (Count Five) because the jurisdictional bar of 8 U.S.C. § 1252 precludes it.[13]  Even if

---

[12] Circuit courts review individual stay motions under a standard substantially similar to preliminary injunctions.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).

[13] Because the TRO, TRO application, and show-cause order implicate solely Count Five, this brief addresses the merits of only that Count.  *See Sierra Forest Legacy*, 577 F.3d at 1022.  If the Court *sua sponte* reviews Petitioners' likelihood of success on the merits of Counts One through Four—counts as to which

§ 1252 did not apply, Petitioners would be unlikely to succeed on the claim because it fails on the merits.

 1.   **The Court Lacks Jurisdiction Over Count Five.**

   a.   **Section 1252 Strips the Court of Jurisdiction Over Count Five.**

Federal law unambiguously strips this Court of jurisdiction over Count Five. The INA provides that "[e]xcept as provided in [§ 1252] . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security ("Secretary")] to . . . execute removal orders against any alien."[14]  8 U.S.C. § 1252(g).

Count Five falls squarely within § 1252(g)'s scope.  Count Five alleges that if ICE executed Petitioners' removal orders, it would violate the Due Process Clause.  Am. Compl. ¶¶ 77–79.  Because Count Five asserts that the execution of Petitioners' removal orders would be unlawful, it "aris[es] from the decision or action by the [Secretary] to . . . execute removal orders against any alien." 8 U.S.C. § 1252(g).  Section 1252(g) thus deprives the Court of jurisdiction over Count Five.

Petitioners argue that § 1252(g) does not apply because, among others reasons, it "should be interpreted narrowly as directed 'against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion.'"  Appl. for TRO at 29 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 485 n.9 (1999)).  But the Ninth Circuit and other courts have held that § 1252(g) applies to an unlawful-removal claim.  *Puri v. Gonzales*, 464 F.3d 1038,

---

Petitioners do not seek preliminary injunctive relief—Respondents respectfully request an opportunity to brief those counts.  ECF No. 33-1.

[14] Under 6 U.S.C. § 557, the references of 8 U.S.C. § 1252 to the Attorney General are deemed to refer to the Secretary of Homeland Security, who has assumed responsibility for immigration-enforcement functions.  *See* 6 U.S.C. § 251(2).

1041 (9th Cir. 2006); *Hamama v. Adducci*, 261 F. Supp. 3d 820, 831 (E.D. Mich. 2017); *Xiaoyuan Ma v. Holder*, 860 F. Supp. 2d 1048, 1059–60 (N.D. Cal. 2012).

In any event, § 1252(g) encompasses only a subset of the claims that fall within § 1252's jurisdictional bar. *AADC*, 525 U.S. at 483. Section 1252(b)(9) provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken . . . to remove an alien from the United States . . . shall be available only in judicial review of a final order [of removal] under [§ 1252]." 8 U.S.C. § 1252(b)(9). Section 1252(a)(5) adds that "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal . . . ." Taken together, "§ 1252(a)(5) and § 1252(b)(9) mean that *any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the PFR process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016); *see also AADC*, 525 U.S. at 483 (characterizing § 1252(b)(9) as an "unmistakable zipper clause," and defining a zipper clause as "[a] clause that says 'no judicial review in deportation cases unless this section provides judicial review'").

The Supreme Court has explained that Congress enacted § 1252(g) largely to clarify that § 1252(b)(9) sweeps broadly. *AADC*, 525 U.S. at 483. Indeed, to ensure that § 1252(b)(9) was not susceptible to the same narrow reading as its predecessor statute,[15] Congress "focus[ed] special attention upon, and ma[d]e special provision for, judicial review of the Attorney General's discrete acts of 'commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders.'" *Id.* (quoting 8 U.S.C. § 1252(g)). In enacting § 1252(g), Congress

---

[15] Before Congress enacted § 1252's jurisdiction-channeling provisions, judicial review of most administrative action under the INA was governed by 8 U.S.C. § 1105a. *AADC*, 525 U.S. at 476. Under § 1105a, some courts held that a district court possessed jurisdiction to review decisions or actions "leading up to or consequent upon final orders of deportation." *Id.* at 483–85 (collecting cases).

"ma[de] it clear" that claims arising from the Secretary's decision to execute a removal order "*are* covered by the 'zipper' clause of § 1252(b)(9)." *Id.*

Section 1252(b)(9) encompasses Count Five. The question whether an alien's removal violates the Due Process Clause is indisputably one that arises from a "removal-related activity." *J.E.F.M.*, 837 F.3d at 1031. As a result, even if § 1252(g) did not apply, § 1252(b)(9) would deprive the Court of jurisdiction over Count Five.

The Court also lacks jurisdiction to grant the relief that Petitioners seek. Petitioners ask the Court to enter "stays of removal to allow them sufficient time . . . to file motions to reopen their removal orders." Am. Compl. ¶ 79. But judges in this District have concluded that § 1252 deprives a district court of jurisdiction to stay a removal order. *Flores v. Johnson*, No. 2:15-cv-7167, 2015 WL 12656240, at *2 (C.D. Cal. Sept. 30, 2015) (collecting cases). As one judge explained, a "request to halt the execution of a final removal order 'arise[s] from' an 'action' or a 'proceeding' brought in connection with [an alien's] removal (8 U.S.C. § 1252(b)(9)), or from 'the decision or action' to 'execute removal orders against' [the alien] (8 U.S.C. § 1252(g))." *Id.* (citing *AADC*, 525 U.S. at 492). For that reason, Petitioners may not obtain a stay of removal from this Court. If they wish to obtain a stay of removal or Article III review of their unlawful-removal claim, they must follow the process prescribed by Congress—by seeking relief in immigration court, appealing to the Board, and then filing a PFR with a court of appeals. 8 U.S.C. § 1252(a)(5). Holding otherwise would thwart Congress' statutory scheme and impermissibly impinge on the Executive Branch's authority to enforce immigration law.

//

//

11

### b.  As Applied, § 1252 Does Not Violate the Suspension Clause.

Despite Petitioners' arguments to the contrary, § 1252's jurisdiction-channeling provisions do not violate the Suspension Clause.[16]  *Puri*, 464 F.3d at 1042.  Congress may eliminate district-court habeas jurisdiction so long as it provides an "adequate substitute."  *Singh v. Mukasey*, 533 F.3d 1103, 1106 (9th Cir. 2008) (citing *Swain v. Pressley*, 430 U.S. 372, 381 (1977)).  In the context of Petitioners' emergency request to stay the execution of their removal orders, an adequate substitute for habeas corpus must afford Petitioners "a meaningful opportunity" to demonstrate that the Government intends to remove them pursuant to "the erroneous application or interpretation of relevant law."  *Id.* (quoting *Boumediene v. Bush*, 553 U.S. 723, 779 (2008)).

The immigration courts and Board afford Petitioners a meaningful opportunity to avoid wrongful removal.  Those courts hold jurisdiction to adjudicate motions to stay removal, 8 U.S.C. § 1103; 8 C.F.R. §§ 1003.2(f), 1003.6(b), 1003.23(b)(1)(v), and rapidly do so in emergency cases.  Decl. of Deputy Chief Immigration Judge Print Maggard (Jan. 11, 2018) ("Maggard Decl.") ¶¶ 13, 16, Ex. D; Decl. of Christopher Gearin (Jan. 9, 2018) ("Gearin Decl.") ¶¶ 12, 17, Ex. E (The Board assigns emergency stay requests the "utmost priority.").

Petitioner Neth's case demonstrates that the immigration courts and Board provide an adequate and effective forum for Petitioners to obtain emergency stays of removal.  After Neth filed this action, he moved the Board to reopen his removal proceedings and stay his removal order.  Schultz Decl. II ¶ 19.  Three days later, the Board entered a stay.  *Id.*  In doing so, the Board awarded emergency relief almost as quickly as this Court did (the Court entered a TRO two days after Petitioners applied for one), and in advance of Neth's expected removal date.

---

[16] "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. I, § 9, cl. 2.

Neth's case is not atypical.  Immigration courts and the Board quickly and carefully review emergency stay motions to evaluate whether the movant will be removed pursuant to the erroneous application or interpretation of relevant law. Maggard Decl. ¶¶ 11, 13, 15–16; Gearin Decl. ¶¶ 12, 17.  Because immigration courts conduct such review, they provide an adequate substitute for district-court jurisdiction to stay the execution of Petitioners' removal orders.  Accordingly, § 1252 does not violate the Suspension Clause as applied.

### c.  The *Hamama* Court Erred in Failing to Distinguish Between Motions to Reopen and Motions to Stay.

The Court's temporary restraining order relied on one authority: *Hamama v. Adducci*, No. 17-CV-11910, 2017 WL 2684477 (E.D. Mich. June 22, 2017).  In *Hamama*, a district court stayed the removal orders of a class of Iraqi aliens.  261 F. Supp. 3d 820, 840–41 (E.D. Mich. 2017).  The court recognized that § 1252 deprives a district court of jurisdiction to stay the execution of a removal order, but nevertheless assumed jurisdiction on the theory that § 1252 violated the Suspension Clause as applied.  *Id.* at 831.

The *Hamama* court concluded that the immigration courts and Board did not adequately substitute for district-court habeas jurisdiction in that case because "a confluence of extraordinary circumstances" impeded the Iraqis' ability to file motions to reopen.[17]  *Id.* at 830.  But in evaluating the impediments to filing

---

[17] For example, the court noted that: (1) for years, Iraq had generally refused to accommodate removals, which "led [p]etitioners . . . to reasonably conclude that filing a motion to reopen was an academic exercise;" (2) petitioners had "reasonably" chosen not "to incur the prohibitive cost of filing a motion to reopen, which can reach up to $80,000;" (3) if removed, petitioners would face torture and persecution at the hands of ISIS, which would render them unable to file motions to reopen from Iraq; and (4) ICE had suddenly detained the petitioners "in facilities far from home and with limited phone access," which "greatly hindered their ability to file motions to reopen."  *Hamama*, 261 F. Supp. 3d at 832–33.  The Government continues to dispute these conclusions and has appealed to the Court

13

motions to reopen, the court sidestepped the relevant question: whether the immigration courts and Board provided a constitutionally adequate forum for the petitioners to obtain emergency stays of removal.

Because the *Hamama* court examined an extraneous issue, it reached an erroneous conclusion.  Regardless of whether the *Hamama* petitioners faced significant impediments to filing motions to reopen, they did not face similar impediments to obtaining stays of removal.  *Compare* 8 C.F.R. § 1003.2(c), (g) (setting numerous procedural and substantive requirements with respect to motions to reopen, including that the motion "state the new facts that will be proven" and "be supported by affidavits or other evidentiary material"), *and* 8 C.F.R. § 1003.23(b)(1)(i)–(ii), (b)(3) (same), *with* 8 C.F.R. § 1003.2(f) (imposing no requirements on motions to stay), 8 C.F.R. § 1003.6 (same); *and* 8 C.F.R. § 1003.23(b)(1)(v) (same).[18]  Rather than seeking a stay in federal district court, the *Hamama* petitioners, like Petitioners here, could have filed immigration-court motions that briefly described their emergency circumstances, requested a stay of removal, and recited the legal basis to reopen their cases.

---

of Appeals for the Sixth Circuit. *See Hamama v. Homan*, No. 17-2171 (6th Cir.) (appeal pending).

[18] The BIA Practice Manual states that the Board "entertains stays only when an appeal, a motion to reopen, or a motion to reconsider is pending before [it]." § 6.3(a).  The Immigration Court Practice Manual contains a similar provision. § 8.3.  But those provisions cannot explain the *Hamama* court's failure to distinguish between motions to reopen and motions to stay.  *See, e.g.*, 261 F. Supp. 3d at 827 (finding that motions to reopen take months to prepare).  When an alien requests an emergency stay of removal, he may accompany the request with a barebones motion to reopen that briefly recites the motion's legal basis and states that a memorandum and supporting evidence will follow.  *See* Maggard Decl. ¶ 15. Even a one-page motion could suffice under emergency circumstances.  *See id.*; *see also* BIA Practice Manual § 6.3(b) (authorizing "telephonic stay request[s]" in emergency cases).

1      The *Hamama* court failed to distinguish between motions to reopen and

2 motions to stay. "[P]reparing a motion to reopen" may be "a difficult task," 261 F.

3 Supp. 3d at 826–27, but that difficulty does not bear on the adequacy of

4 immigration-court jurisdiction to issue emergency stays of removal. The

5 immigration courts and Board provide effective forums for aliens to obtain such

6 stays. As a result, those forums function as an adequate substitute for district-court

7 habeas jurisdiction. For this and other reasons, the *Hamama* court wrongly

8 concluded that § 1252 violated the Suspension Clause as applied.

9     **2. Even If § 1252 Did Not Apply, Petitioners Would Be Unlikely to**

10        **Prevail on Count Five.**

11      Petitioners' unlawful-removal claim (Count Five) fails on the merits for two

12 reasons. First, the Government has afforded Petitioners procedural due process—

13 "the opportunity to be heard at a meaningful time and in a meaningful manner."

14 *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Second, Petitioners have failed to

15 demonstrate that they would suffer prejudice if they did not receive a last-minute

16 opportunity to challenge their removal orders.

17     **a. Petitioners Have Received Constitutionally Sufficient Process.**

18      On the merits, Count Five presents the question whether Petitioners, who

19 have received an opportunity to challenge their removability and been ordered

20 removed, hold a procedural-due-process right to receive an additional, last-minute

21 opportunity to challenge their removal orders. The Court should answer in the

22 negative because Petitioners have received constitutionally sufficient process.

23      "Procedural due process imposes constraints on governmental decisions

24 which deprive individuals of 'liberty' or 'property' interests within the meaning of

25 the [Fifth Amendment] Due Process Clause." *Mathews*, 424 U.S. at 332. "The

26 fundamental requirement of [procedural] due process is the opportunity to be heard

27 at a meaningful time and in a meaningful manner." *Id.* at 333 (quoting *Armstrong*

28 *v. Manzo*, 380 U.S. 545, 552 (1965)). To determine whether procedural

protections satisfy the Due Process Clause, courts consider three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Id.* at 335.

Here, the first factor favors the Government.  Although aliens who have lived in the United States for many years generally have a "strong liberty interest" in remaining in the country, *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1068–69 (9th Cir. 1995), aliens who are subject to final removal orders have a "lesser liberty interest" than aliens who have not been ordered removed.  *Cf. Diouf v. Napolitano*, 634 F.3d 1081, 1086–87 (9th Cir. 2011) (drawing such a distinction with respect to the interest in freedom from detention).  Because Petitioners have been ordered removed, they have a lesser liberty interest in remaining in the United States.

The second *Mathews* factor also favors the Government.  Under existing procedures, the Government is unlikely to remove Petitioners erroneously.  Each Petitioner has received an opportunity to challenge his or her removability and seek relief from removal before an immigration court, the Board, and a court of appeals.  To the extent that relevant circumstances have changed since Petitioners' removal orders became final, existing procedures safeguard against erroneous removals because Petitioners may file motions to reopen on the basis of such changes.[19]  8 U.S.C. § 1229a(c)(7); 8 C.F.R. §§ 1003.2(c), 1003.23(b)(3).  Even as

---

[19] Motions to reopen are subject to procedural rules, including time and numerical limitations.  8 U.S.C. § 1229a(c)(7)(C)(i); 8 C.F.R. §§ 1003.2(c)(2), 1003.23(b)(1). Those limitations likely apply in many of Petitioners' cases.  But a court does not violate due process when it enforces procedural rules, even if doing so leads it to reject a substantively valid claim.  *See Maksoudian v. Gonzales*, 171 F. App'x 167,

to Petitioners who chose not to file motions to reopen until ICE detained them, existing procedures safeguard against erroneous removals because Petitioners can obtain emergency stays of removal from the immigration courts, Board, or courts of appeals.  8 U.S.C. § 1252(b)(3)(B); 8 C.F.R. §§ 1003.2(f), 1003.6, 1003.23(b)(1)(v).

The third *Mathews* factor—the value of additional safeguards relative to the fiscal and administrative burdens that they would impose—favors the Government. Petitioners propose that the Court enjoin ICE from removing them until they receive "sufficient time and access to attorneys to file motions to reopen their removal orders before immigration courts."  Am. Compl. ¶ 79.  But that safeguard would provide little or no additional value because the immigration courts, Board, and courts of appeals are equipped to decide emergency stay motions.

Petitioners' proposed safeguard also would disrupt the removal system.  If every alien knew that he could obtain a last-minute stay of removal from a district court, he would have little incentive to challenge his removal order at an earlier time.  And last-minute stays drain ICE's limited resources.  To remove an alien, ICE must obtain a travel document from the removal country.  Because travel documents usually expire in a year or less, *see, e.g.*, *Perreira v. Faraquharson*, No. 3:02-cv-769, 2002 WL 31094957, at *1 (D. Conn. Aug. 15, 2002), ICE often must restart the removal process if an alien obtains a stay of removal.

The Due Process Clause does not require that aliens receive an additional, last-minute opportunity to challenge their removal orders.  Existing procedures safeguard against erroneous removals, and the substantial costs of last-minute stays outweigh their minimal value (if any).  Petitioners are unlikely to prevail on their

---

168 (9th Cir. 2006) (finding that the Board did not violate due process when it applied the limitations of 8 C.F.R. § 1003.2(c)(2) to a motion to reopen, despite the movant's eligibility for adjustment of status).

unlawful-removal claim, and consequently are not entitled to a preliminary injunction.

### b. Petitioners Fail to Show that They Would Suffer Prejudice in the Absence of a Last-Minute Opportunity to Challenge Their Removal Orders.

"As a predicate to obtaining relief for a violation of procedural due process rights in immigration proceedings, an alien must show that the violation prejudiced him." *Padilla v. Ashcroft*, 334 F.3d 921, 924–25 (9th Cir. 2003). In the present context, even if Petitioners established a due process violation, they would be entitled to district-court stays of removal only if they demonstrated that they would suffer prejudice in the absence of a last-minute opportunity to challenge their removal orders.

Petitioners likely would not suffer prejudice in the absence of an opportunity to file motions to reopen. Indeed, Petitioners' motions would be procedurally barred unless equitable considerations tolled the otherwise-applicable 90-day limitations period. 8 U.S.C. § 1229a(c)(7)(C)(i) ("Except as provided in this subparagraph, the motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal.");[20] 8 C.F.R. §§ 1003.2(c)(2), 1003.23(b)(1); *Socop-Gonzalez v. INS*, 272 F.3d 1176, 1181 (9th Cir. 2001) (holding that the limitations period is subject to equitable tolling). And the basis on which Petitioners propose to challenge their removal orders—post-order

---

[20] No statutory or regulatory exception appears to apply in Petitioners' cases. *Compare* 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. §§ 1003.2(c)(3), 1003.23(b)(4) (providing, among other exceptions, that the limitations period does not apply to motions to reopen "based on changed circumstances arising in the country of nationality"), *with* TRO Appl. at 24–25 (stating that Petitioners intend to file motions to reopen on the basis of post-order changes in law).

changes in law[21]—"does not constitute a basis for equitable tolling."  *In re Juan Beltran Ortiz*, 2016 WL 3924042, at *2 (BIA June 6, 2016) (citing *Matter of X-G-W-*, 22 I&N Dec. 71 (BIA 1998)).

Petitioners' motions to reopen would likely be procedurally barred.  *Id.*  As a result, Petitioners cannot demonstrate that they would suffer prejudice in the absence of an opportunity to file motions to reopen.  Because Petitioners have not satisfied the prejudice requirement, *Padilla*, 334 F.3d at 924–25, they are not entitled to stays of removal regardless of whether they have established a procedural-due-process violation.  Accordingly, Petitioners are unlikely to succeed on their unlawful-removal claim.

### B.  Petitioners Fail to Demonstrate Irreparable Harm.

Petitioners fail to demonstrate the requisite irreparable harm to warrant preliminary injunctive relief.  Their failure to bring timely motions to reopen is self-inflicted, and the cure to their purported predicament is provided through alternative remedies at law.  They allege that their removals will cause hardship to their families and themselves, but nothing is extraordinary about Petitioners' removals, and the ordinary hardships that arise from removal do not constitute irreparable harm.  *See Nken v. Holder*, 556 U.S. 418, 438 (2009).  For the vast majority of the putative class who are not currently detained, a stay of removal would not address any immediate threat of harm.  Petitioners thus have not demonstrative the requisite irreparable harm, and the Court should deny injunctive relief.

---

[21] Some Petitioners claim that their removal orders arise from criminal convictions that no longer constitute aggravated felonies or crimes involving moral turpitude.  *See* TRO Appl. at 24.  Others claim that "[post-order] federal court decisions ma[k]e them eligible for discretionary relief from deportation."  *Id.* at 25.  A third group of Petitioners claim that they are eligible to move to vacate, or that courts have vacated, the criminal convictions that form the basis for their removal orders.  *Id.* at 25–26.  These prospective claims rely on changes in law that postdate Petitioners' removal orders.

First, Petitioners have failed to demonstrate irreparable harm because the harms they claim are generally self-inflicted. When a harm is self-inflicted, it cannot form the basis for injunctive relief. *See Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995). For example, when an alleged injury "is due in part to [a plaintiff's] own failure to obtain a judicial determination of [his] rights and obligations at some earlier point in time," a court should not award injunctive relief on the basis of that alleged injury. *See Ventura Cty. Christian High Sch. v. City of San Buenaventura*, 233 F. Supp. 2d 1241, 1253 (C.D. Cal. 2002) (citing *Caplan*, 68 F.3d at 839).

Petitioners claim, for instance, that "[t]he speed with which the Government plans to carry out their removals" limits their ability to file motions to reopen, but the speed of the removal process would not harm Petitioners if they had not slept for many months or years on their legal rights. Appl. for TRO at 9. Chhoeun failed to file a motion to reopen in the 14 years since his removal order became final. Schultz Decl. I ¶ 25. The other putative class members likewise have failed for many months or years to exercise their right to file motions to reopen. Notably, the 113 individuals sent to Louisiana for interviews, whose removal orders date back as far as 1993, have filed only sixteen motions to reopen. McDowell Decl. ¶ 6. Given that Petitioners' alleged harms arise from their "failure to obtain a judicial determination of their rights and obligations at some earlier point in time," injunctive relief is inappropriate. *Ventura Cty. Christian*, 233 F. Supp. 2d at 1253.

Petitioners also state that they are entitled to an opportunity to attack their removal orders based on intervening changes in law. Appl. for TRO at 24–25. But almost all changes in immigration law cited by Petitioners are several months or years old, and many Petitioners received a meaningful opportunity to mount attacks on the basis of those changes in their removal proceedings. If the Court enjoins the execution of Petitioners' removal orders despite the fact that Petitioners failed to file timely motions to reopen, there would be no reason for any alien to

take the initiative until the threat of removal became imminent.  Indeed, all aliens would be incentivized to delay, knowing that a district court would ultimately enter a stay of removal to give them additional time.

Unlike petitioners in *Hamama*, Petitioners here are not seeking to reopen their removal proceedings based on claims that changed circumstances in their native country make it extremely perilous for them to return.  Indeed, 18 putative class members who are currently detained pending removal have filed motions asking the Court to release them from the litigation, which would allow them to be removed.  ECF Nos. 42-59.

Petitioners allege that Cambodian officials attempted to extort money and valuables possibly from individuals during the interview process, which was allegedly veiled with an undescribed threat.  Am. Compl. at 21.  But any harm purported by these claims is speculative and does not rise to irreparable harm that can undergird a preliminary injunction order to stay the removal of the putative class.  *See Caribbean Marine Servs. Co. v. Baldige*, 844 F.2d 668, 674 (9th Cir. 1988).

In general, Petitioners have delayed seeking the relief that they could find through other remedies at law.  "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  As demonstrated by Neth's motion to reopen and administrative stay, petitioners have an adequate process by which they could have moved to reopen their removals.  *See* Schultz Decl. II ¶ 5.  Notably, Petitioners have had generally unrestricted access to legal counsel throughout their detention.  See Schultz Decl. II 12.  Since this litigation commenced, eight of the detained aliens have filed motions to reopen (four of which have been granted) and six have received stays of removal.[22]  McDowell Decl. ¶¶ 6-7.  This Court should

---

[22] Putative class member Chin has been litigating his motion to reopen for a year and has been denied motions to stay his removal *three* times by the Fourth Circuit

not grant injunctive relief when Petitioners should be seeking relief through immigration courts or the Board.

Second, Petitioners allege that "[d]eportations cause real and lasting damage to deportees, their families, and their communities." Appl. for TRO at 35. As the Supreme Court has emphasized, "the burden of removal alone cannot constitute the requisite irreparable injury" to stay removal. *Nken*, 556 U.S. at 438. Petitioners cite two cases where courts have found that hardships to families and aliens may constitute irreparable harm, but those cases involved entirely different allegations of aliens being placed in removal proceedings or subject to prolonged, unconstitutional detention—and not petitioners whose predicament arose from their own delay. Petitioners cite no case where a court has found that the burdens of removal alone constitute irreparable harm to stay the removal of movants subject to final removal orders. Indeed, the Supreme Court has stated "[i]t is accordingly plain that the burden of removal alone cannot constitute the requisite irreparable injury." *Nken*, 556 U.S. at 435 (finding no irreparable harm for aliens subject to final removal orders with pending petitioners for review).

Third, to the extent that Petitioners seek a stay of removal and other relief for all 1,900 putative class members, only 92 face an imminent likelihood of removal—72 with travel documents and 20 for which officials are exchanging further information in an effort to facilitate the issuance of travel documents. Schultz Decl. II ¶ 18. Any harm to the remaining approximately 1,800 putative class members is not immediate and is wholly speculative. *See Caribbean Marine Servs. Co.*, 844 F.2d at 674. As a prerequisite to preliminary injunctive relief, a movant must demonstrate "immediate threatened injury." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980) (citation omitted). Irreparable harm must be likely, not merely possible or plausible.

---

based on the merits of his case. *Chin*, No. 17-1401 Order (4th Cir. Apr. 6, 2017), Ex. H; Order (4th Cir. Oct. 30, 2017), Ex. I; Order (4th Cir. Dec. 13, 2017), Ex. J.

*Winter*, 555 U.S. at 22.  Again, the few who face removal in the immediately foreseeable future have had an ample opportunity to bring individual requests for stays of removal through motions with the immigration court or Board.

Petitioners' alleged irreparable harm is self-inflicted, constitutes no more than the usual burden of removal, and for the vast majority not currently detained, is entirely speculative.  Thus, the Court should deny Petitioners' request for injunctive relief for failure to demonstrate the requisite irreparable harm.

**C.  The Balance of Equities and the Public Interest Favor Respondents.**

The remaining factors weigh heavily in favor of the government.  Where the government is the opposing party, the balance of equities and public interest factors merge.  *Nken*, 556 U.S. at 435.  Indeed, "the public interest favors applying federal law correctly."  *Small v. Avanti Health Systems, LLC,* 661 F.3d 1180, 1197 (9th Cir. 2011)); *see also N.D. v. Haw. Dep't of Educ*., 600 F.3d 1104, 1113 (9th Cir. 2010) ("[I]t is obvious that compliance with the law is in the public interest."). Notably, the government and the public have a strong interest in the prompt execution of removal orders.  *Nken*, 556 U.S. at 434-35 ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

A preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing the irreparable loss of rights before judgment.  *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1234 (9th Cir. 1999), supplemented, 236 F.3d 1115 (9th Cir. 2001).  Maintaining the Government's lawful authority to effectuate Petitioners' removal orders, the true status quo in this litigation, outweighs any alleged harm.  "There is always a public interest in prompt execution of removal orders: the continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permits and prolongs a continuing violation of United States law."

*Nken*, 556 U.S. at 436.  This is especially true where, as here, the Executive Branch seeks to remove aliens who were convicted of violent crimes.

If the Court enters a preliminary injunction on grounds that Petitioners *might* now be able to file a successful motion to reopen their proceedings, the precedent would be profound.  Granting preliminary injunctive relief would violate the letter and the intent of the jurisdictional structure of the INA, veer dramatically from the statutory and regulatory scheme of post-order detention and removal, and create a substantial loophole in the immigration laws.  For each removal, ICE must work diligently to secure a travel document and make arrangements, at government cost, to remove the individual.  Costs are compounded with each delay—of on-going detention, record-keeping, travel expenses, and the numerous other efforts and expenditures necessary to remove each individual who has exhausted all administrative and judicial appeals.  *See, e.g.*, Schultz Decl. II ¶¶ 14-18.  For removals to Cambodia, arrangements are carefully negotiated with the Cambodian government and information for each individual is carefully presented for consideration.  *Id.* ¶ 14.  If the Court imposes a last-minute delay not provided by Congress or warranted under the Constitution, the Court would set a dangerous precedent that could hobble ICE's efforts to remove aliens around the globe.

Here, the Court is not presented with extraordinary circumstances that compel the grant of Petitioners' request.  Petitioners face no hardship beyond the normal hardship of removal, but nonetheless seek an extraordinary remedy, here, that would only prolong their detention pending removal and provide them with a novel ability to forestall their removals.  Thus, the government has an especially strong interest in enforcing the immigration laws by removing aliens, like Petitioners, who are clearly in violation of the INA.  *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) ("'[T]here is a strong societal interest in controlling immigration and in effectively policing our borders.'") (quoting *United States v. Cupa-Guillen*, 34 F.3d 860, 863 (9th Cir. 1994)).  Indeed,

any injunctive order that enjoins a governmental entity from enforcing statutes enacted by the duly elected representatives of the people constitutes an irreparable injury that weighs heavily against the entry of injunctive relief. *See Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).

Petitioners seek an injunction that would prevent or stall removal of criminal aliens who are subject to final orders of removal and result in their release pending receipt of travel documents. Petitioners' case is like the one presented to Justice O'Connor, sitting as a Circuit Justice, when she was asked for an order granting a stay in *INS v. Legalization Assistance Project*, 510 U.S. 1301 (1993). Plaintiffs in that case argued that the INS was "violating the law of the land," and they "ask[ed] the federal courts to stop this." *Id.* at 424. Justice O'Connor refused, writing that the "broad power to 'take Care that the Laws be faithfully executed' is conspicuously not granted to [the courts] by the Constitution. Rather, it is given to the President of the United States . . . along with the power to supervise the conduct of the Executive Branch," *id.*, which includes DHS and ICE.

Petitioners' request would be an "improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Id.* Accordingly, the public interest would not be served by this request, and the Government's interest in enforcing outweighs any alleged harm imposed by the execution of Petitioners' valid and pending removal orders.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Petitioners' request for a preliminary injunction.

//

//

Dated:  January 11, 2018                    Respectfully submitted,

                                            CHAD A. READLER
                                            Acting Assistant Attorney General
                                            Civil Division

                                            WILLIAM C. PEACHEY
                                            Director, District Court Section
                                            Office of Immigration Litigation

                                            TIMOTHY M. BELSAN
                                            Senior Litigation Counsel

                                            ARAM A. GAVOOR
                                            Senior Litigation Counsel

                                            /s/ Troy D. Liggett
                                            TROY D. LIGGETT
                                            Trial Attorney
                                            Florida Bar No. 0086788
                                            District Court Section
                                            Office of Immigration Litigation
                                            Civil Division
                                            U.S. Department of Justice
                                            P.O. Box 868, Ben Franklin Station
                                            Washington, DC 20044
                                            (202) 532-4765; (202) 305-7000 (fax)
                                            troy.liggett@usdoj.gov

                                            JOSEPH F. CARILLI, JR.
                                            Trial Attorney

                                            JULIAN M. KURZ
                                            Trial Attorney

                                            *Counsel for Respondents*