# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| NAK KIM CHHOEUN AND MONY NETH, individually and on behalf of a class of similarly situated individuals,<br><br>Petitioners,<br><br>v.<br><br>DAVID MARIN, DAVID JENNINGS, THOMAS HOMAN, ELAINE DUKE, JEFFERSON SESSIONS III, SANDRA HUTCHENS, AND SCOTT JONES,<br><br>Respondents. | Case No.: SACV 17-01898-CJC(GJSx)<br><br><br>**ORDER GRANTING PRELIMINARY INJUNCTION** |

//

//

//

## I. INTRODUCTION

Our Constitution demands that all persons, both citizens and noncitizens, be given due process before the Government takes away a person's right to work and live in the United States. Sadly, for Petitioners here, they were denied due process by the Government when it detained them and threatened to deport them without adequate notice and an opportunity to be heard.

Petitioners are 92 Cambodian citizens who are living in the United States.[1] Many fled Cambodia in the 1970s as small children to escape the brutal Khmer Rouge regime. Although Petitioners have been living in the United States for many years, they were all subject to orders of removal to Cambodia based on criminal convictions that they suffered years ago. When the orders of removal were issued, which in many cases occurred over a decade ago, Petitioners were not deported because Cambodia refused to accept their repatriation. Instead, U.S. Immigration and Customs Enforcement ("ICE") determined that Petitioners were not flight risks and did not pose a danger to society. Accordingly, Petitioners were released from custody and returned to their families and communities. Since then, Petitioners have served as peaceable and productive members of our society, and their removal orders laid dormant.

In October 2017, ICE took Petitioners away from their communities and families when it suddenly commenced a series of raids to detain them. Without warning, armed ICE officers raided Petitioners' homes and workplaces. Some Petitioners were detained

---

[1] This putative class action was brought on behalf of approximately 1,900 individuals who received orders of removal to Cambodia but were subsequently released from custody and have since been living in the United States. (Dkt. 27 ¶ 48.) The instant request for a preliminary injunction does not apply to the entire class, but only to a subset of the class. When the Court employs the term "Petitioners" in this Order, the Court is referring to that subset, composed of 92 individuals who were detained by U.S. Immigration and Customs Enforcement beginning on October 1, 2017 and for whom travel documents have been or are expected to be issued.

at ICE offices when they reported for what they assumed were perfunctory meetings. Approximately 100 Petitioners were detained in the October 2017 raids and 92 remain in ICE custody. ICE still has not afforded Petitioners an adequate opportunity to challenge their current detention or the underlying orders of removal. Instead, ICE continues to detain most of them and plans to deport most of them to Cambodia at any time.

Petitioners ask this Court for limited relief—a brief stay of deportations during which Petitioners may reopen their immigration proceedings and challenge their removal orders. Specifically, Petitioners request that their removals be enjoined until February 5, 2018, in order to file motions to reopen. For those who file a motion to reopen, Petitioners request that the stay be extended through the adjudication of the administrative proceedings and, if necessary, until they have submitted motions to stay in the appropriate court of appeals.

The removal orders Petitioners seek to reopen have lain dormant, in many cases for over a decade. Circumstances have changed in the interim that may allow Petitioners to raise serious questions regarding the validity of their underlying convictions and removal orders. Denying Petitioners the right to do so amounts to a denial of due process. Accordingly, the Court **GRANTS** Petitioners' request for injunctive relief.

## II. BACKGROUND

### A. Procedural History

Named Petitioners Nak Kim Chhoeun and Mony Neth brought this action on October 27, 2017, soon after ICE began to round up and detain Petitioners without notice. (Dkt. 1 [Complaint]; *see also* Dkt. 27 [First Amended Habeas Corpus Petition and

Complaint, hereinafter "FAC"].)  In this lawsuit, Petitioners contend that their detention and impending removals violate due process.  (*See generally id*.)

In early December 2017, after Petitioners had been detained for approximately two months, they learned that the first flight to Cambodia was scheduled for the morning of December 18, 2017, and that the Government planned to complete removals by the end of that month.  (Dkt. 28 ["TRO App."] at 1.)  In light of the imminent removals, Petitioners filed an application for a temporary restraining order on December 12, 2017, asking the Court to stay deportations for approximately 60 days until February 5, 2018. (*See generally* TRO App.)  Petitioners explained that this additional, limited time was necessary to give those who wanted to file motions to reopen their removal orders an opportunity to do so.  (*Id*.)  On December 14, 2017, the Court granted the temporary restraining order and stayed the deportations for a period of 28 days.  (Dkt. 32.)  The Court also ordered the parties to show cause why a preliminary injunction should not issue and set the preliminary injunction hearing for January 11, 2018.  (*Id*.)  The parties then stipulated, at the Government's request, to extend the term of the temporary restraining order and to continue the preliminary injunction hearing to January 25, 2018. (Dkts. 39, 40.)

Since the Court granted the temporary restraining order, Petitioners' counsel have worked to identify, locate, and interview the 92 Petitioners who have been issued travel papers or who are being considered for travel papers.  (Dkt. 62 at 4.)  This has not been an easy task, as Petitioners are being held in and transferred between various detention facilities, and the Government has refused to identify and release key documents related to them.  (*Id*.; Dkt. 62-6 [Supplemental Declaration of Anoop Prasad, hereinafter "Supp. Prasad Decl."] ¶¶ 13–14, 18.)  Notwithstanding these obstacles, Petitioners' counsel have been able to provide or facilitate legal consultations for 42 Petitioners.  (Supp. Prasad Decl. ¶ 14.)  Of the 42 Petitioners who received legal consultations, eleven Petitioners

have secured counsel to file motions to reopen.  (*Id*.)  Petitioners represent that additional motions to reopen will be filed within the next few days, and reiterate their request that deportations be stayed so that these additional motions can be filed and litigated.  (Dkt. 62 at 5.)

## B.  Petitioners' Background

Many Petitioners are refugees who fled Cambodia in the 1970s as small children to escape the Khmer Rouge's campaign of mass murder and torture.  (FAC ¶ 1.)  Since then, Petitioners have made their homes in the United States and serve as integral members of their families and communities.  (*Id*.)  Almost all are lawful permanent residents and have parents, spouses, and children who are U.S. citizens.  (*Id*. ¶¶ 1–2.)

### 1.  Nak Kim Chhoeun

Petitioner Nak Kim Chhoeun was born in Cambodia in 1975.  (Dkt. 28-2 [Declaration of Nak Kim Chhoeun, hereinafter "Chhoeun Decl."] ¶ 2.)  He fled Cambodia with his parents and siblings when he was three years old.  (*Id*.)  Chhoeun's family spent time in a refugee camp in Thailand and in the Philippines before entering the United States in June 1981.  (*Id*.)  Upon entering the United States they lived in Fort Worth, Texas, and one or two years later they settled in Long Beach, California.  (*Id*. ¶ 3.)  Chhoeun's parents and six siblings are U.S. citizens.  (*Id*. ¶ 2.)

Sometime around 1999, when Chhoeun was in his early 20s, he found himself involved in a gang-related incident.  (*Id*. ¶ 4; TRO App. at 3.)  The incident occurred when Chhoeun agreed to drive his friend's brother to run an errand.  (Chhoeun Decl. ¶ 4.)  Although Chhoeun did not know it at the time, the neighborhood they drove into had a reputation for being dangerous and when they arrived, people approached his car and

threw bottles at it.  (*Id.*)  Chhoeun tried to drive away, but his friend's brother pulled out a gun and shot at a parked car.  (*Id.*)  No one was injured and police were not called to the scene.  (*Id.*)

Chhoeun later learned that the individuals who approached his car were members of a gang.  (*Id.* ¶ 4.)  Police subsequently questioned the gang members and learned of Chhoeun's involvement.  (*Id.*)  Based on the information gathered by the police, the District Attorney pressed charges against Chhoeun.  (*Id.*)  It is not clear from the record precisely what Chhoeun was charged with and the disposition of these charges.  Chhoeun states in his declaration that he went to trial for at least some of the charges—though he does not clarify which ones—and that a jury convicted him but he was ultimately acquitted on appeal.  (*Id.*)  Chhoeun further claims that while his appeal was pending, he learned that there were additional charges filed against him for possession of a firearm and simple assault.  (*Id.* ¶ 5.)  Chhoeun claims that he knew nothing about these charges until the District Attorney offered him a plea deal.  (*Id.*)  He claims that there were no hearings regarding these charges and that he did not know any of the facts alleged, including the purported victim.  (*Id.*)  Chhoeun nevertheless accepted a plea agreement and was sentenced to a term of imprisonment for two years.  (*Id.*; Dkt. 29 ["TRO Opp."] at 3.)  On the other hand, and contrary to Chhoeun's contentions, the Government claims that a jury convicted Chhoeun for the two crimes that he claims he knew nothing about.  (TRO Opp. at 3.)  The Government makes no reference to any appeal or ultimate acquittal.

In 2003, after Chhoeun served his sentence of imprisonment, he received an order of removal from an immigration judge.  (Chhoeun Decl. ¶ 7.)  Chhoeun was placed in ICE custody pending deportation, but was released after six months because Cambodia would not accept his repatriation.  (*Id.*)  When ICE released Chhoeun, in November 2003,

ICE determined that Chhoeun presented no danger or flight risk such that his release was warranted. (TRO App. at 3.)

Since November 2003, Chhoeun has had no convictions or arrests and has complied with the conditions of his release. (Chhoeun Decl. ¶¶ 8–9.) For over 14 years, Chhoeun has served as a productive member of his workplace, family, and community. (*Id*.) He has been gainfully employed since 2004, and for the past three years he has worked as a technician for AT&T. (*Id*. ¶ 9.) In 2016, he received the highest accolade available to the 275 technicians employed by AT&T—technician of the year. (*Id*.) Chhoeun is also a key decisionmaker in his family and in 2004 was called on to decide whether to remove his father from life support. (*Id*. ¶ 10.) Since his father passed away in 2004, Chhoeun has visited his mother every day. (*Id*. ¶ 11.) These visits are necessary because his mother, whose own parents and other family members were killed by the Khmer Rouge regime, suffers from several medical conditions and disabilities. (*Id*.) Chhoeun's hospitality extends not only to his customers and family, but also to other members of the community. He recently learned that a former colleague had become homeless. (*Id*. ¶ 12.) Although Chhoeun was living in a studio apartment, he housed and helped his former colleague to obtain a job. (*Id*.) Through Chhoeun's help, he was able to regain employment and his own place to live. (*Id*.)

On October 14, 2017, Chhoeun received a letter stating that he should report to the local ICE office. (*Id*. ¶ 13.) The letter did not explain why he was required to report or whether his release would be revoked. (*Id*.) When Chhoeun reported to ICE, he was detained without any explanation or notice. (*Id*.) Since his detention, Chhoeun has been working with counsel to file a motion to reopen and challenge his deportation. (Dkt. 62 at 5 n.7.)

//

### 2. Mony Neth

Mony Neth was born in Cambodia in 1975 and fled the Khmer Rouge with his family when he was a child. (Dkt. 28-9 [Declaration of Mony Neth, hereinafter "Neth Decl."] ¶ 2.) Neth's family arrived in the United States in 1985, and settled in Modesto, California. (*Id*. ¶¶ 2–4.) Neth thereafter became a lawful permanent resident. Neth continues to live in Modesto today with his wife, sixteen-year-old daughter, and parents, all of whom are U.S. citizens. (*Id*. ¶ 3.)

In 1995, Neth was convicted of unlawful possession of a weapon and receipt of stolen property. (*Id*. ¶ 4.) Neth was sentenced to four years imprisonment, but was released after two and a half years. (*Id*.) In 1997, after Neth was released from prison, ICE detained Neth for removal proceedings. (*Id*. ¶ 5.) Shortly after, ICE determined that Neth did not pose a danger or a flight risk and released him on bond. (*Id*.) Neth then returned to Modesto, and in the past twenty years has not been charged with any additional crime. (*Id*.) Instead, Neth has built a family, is gainfully employed by a solar energy company, and is an active member of his local church. (*Id*. ¶¶ 5, 12.) Through his church, Neth regularly serves meals to the homeless. (*Id*. ¶ 12.)

On July 28, 2017, the Stanislaus County Superior Court granted Neth a Certificate of Rehabilitation for his 1995 conviction. (*Id*. ¶ 13; Dkt. 28-12 [Declaration of Anoop Prasad, hereinafter "Prasad Decl."] Ex. B.) To support the finding of rehabilitation with satisfactory proof, the Court and the District Attorney's office completed a full investigation and hearing. (*Id*.) The Court found that Neth "has demonstrated by the course of conduct [his] rehabilitation and fitness to exercise all the civil and political rights of citizenship." (Prasad Decl. Ex. B.)

On October 19, 2017, ICE officers unexpectedly visited Neth's home and spoke to his mother while he was at work. (Neth Decl. ¶ 8.) The next morning, ICE officers stopped and arrested Neth while he was driving to work. (*Id*. ¶ 9.) Neth received no notice or explanation why he was being detained. (*Id*. ¶ 10.) Neth's family learned he was being detained only after the fact, when an ICE officer drove Neth's car to his home and handed his wife the keys. (Dkt. 28-7 [Declaration of Phounsavath Khamvongsa, hereinafter "Khamvongsa Decl."] ¶ 13.)

On December 6, 2017, while Neth was being detained by ICE, the Governor of California granted Neth a full and unconditional pardon. (Prasad Decl. Ex. A.) In his pardon, the Governor stated that since his conviction, Neth "has lived an honest and upright life, exhibited good moral character, and conducted himself as a law-abiding citizen." (*Id*.) The pardon nullified the immigration consequences of his conviction, and formed the basis of a motion to reopen and a motion for stay of removal, which Neth filed on December 13, 2017. (Supp. Prasad Decl. ¶ 6.)

Neth was one of the Petitioners who were scheduled to be deported on December 18, 2017, before the Court entered the temporary restraining order. (*Id*. ¶ 6.) In light of Neth's impending removal, his counsel requested that the Board of Immigration Appeals ("BIA") expedite the processing of the motion for a stay. (*Id*. ¶ 7.) After persistent efforts by counsel to expedite the process, he received notice on December 21, 2017, that the BIA had granted the stay. (*Id*. ¶¶ 7–11.) On December 22, 2017, ICE released Neth from detention on an order of supervision pending the outcome of his removal proceedings. (Dkt. 60 at 4–5.)

Neth's counsel represents that Neth's experience is extremely uncommon, and that he was able to obtain a stay of removal by "sheer chance" because he knew about Neth's scheduled deportation date. (Supp. Prasad Decl. ¶ 12.) Neth's counsel also believes that

the BIA may have prioritized Neth's motion because of his role as class representative in this case. (*Id.*) In other words, the process of filing motions to reopen and motions for a stay for other Petitioners, who also have meritorious bases to challenge their removals, has not been nearly as expeditious. (*Id.* ¶¶ 13–18.)

### 3. Other Petitioners

Petitioners Chhoeun and Neth exemplify the experiences of the approximately 100 individuals who were detained in the October 2017 raids. Most Petitioners fled Cambodia when they were small children, and the United States is the only home they have ever known. (*See, e.g.*, Dkt. 28-8 [Declaration of Rottanak Kong, hereinafter "Kong Decl."] ¶ 2.) They are subject to removal orders based on crimes they committed over a decade ago, when they were in their teens and twenties. (*Id.* ¶ 5.) Since the removal orders were issued, Petitioners were released from custody and seized upon the opportunity to become productive members of their communities.

Many Petitioners have parents, siblings, spouses, and young children who are U.S. citizens. (*Id.* ¶¶ 5, 12.) These family members rely on Petitioners for financial and emotional support. (*Id.* ¶ 12; Khamvongsa Decl. ¶ 5; Dkt. 28-18 [Declaration of Sareang Ye] ¶ 8.) To highlight just one example, an individual named Rottanak Kong who was subject to the October 2017 raids cites the difficulty that his detention caused his family. (*See generally* Kong Decl.) Kong has seven siblings who are all U.S. citizens. (*Id.* ¶ 3.) Kong's parents have passed away, and he is very close to his siblings. (*Id.* ¶¶ 3, 12.) One of Kong's sisters works with children in public schools in Oakland, California. (*Id.* ¶ 12.) One of Kong's brothers is an active U.S. Marine who is training to serve in Afghanistan. (*Id.*) Another of Kong's brothers suffers from mental health issues and relies on Kong for emotional support. (*Id.*)

After three months of detention, Kong's removal proceedings were reopened and then terminated.  (Dkt. 62-9 [Supplemental Declaration of Rottanak Kong] ¶ 3.)  He was able to file a motion to reopen only through the help of his sister, and understands that without his family's assistance it would have been almost impossible to contact an attorney while in detention.  (*Id*. ¶ 6.)  Although Kong has now been released from detention, his absence caused significant emotional, mental, and physical stress to his family.  (Dkt. 62-9 [Declaration of Chen Kong-Wick] ¶¶ 6, 9.)  His sister cites having to miss work to take over the roles Kong had assumed in his family, including taking care of their brother who suffers from mental health issues and requires significant care and support.  (*Id*.)

## C.  Legal Developments

According to Petitioners, fundamental changes in immigration law and Petitioners' personal circumstances have transpired since the original removal orders were issued.  (TRO App. at 9, 11–14.)  These changes have created grounds to preclude removal in many of Petitioners' cases.  (*Id*.)

One relevant change is the Supreme Court's decision in *Judulang v. Holder*, 565 U.S. 42 (2011).  The Court there considered the BIA's practice of granting relief from removal orders under Section 212(c) of the Immigration and Nationality Act.  *Id*. at 52.  The Court determined that the then-existing practice that determined whether an individual would be eligible for Section 212(c) relief was "arbitrary and capricious" under the Administrative Procedure Act.  *Id*.  The Court found that "[b]y hinging a deportable alien's eligibility for discretionary relief on the chance correspondence between statutory categories—a matter irrelevant to the alien's fitness to reside in this country—the BIA has failed to exercise its discretion in a reasoned manner."  *Id*. at 53.

The Court's holding in *Judulang* effectively expanded the eligibility of Section 212(c) waivers and has afforded some aliens a previously unavailable basis to reopen their immigration proceedings. *See, e.g., Bonilla v. Lynch*, 840 F.3d 575 (9th Cir. 2016).

Petitioners also point to recent Supreme Court jurisprudence that would give many Petitioners grounds to vacate their decades-old guilty pleas and the underlying removal orders. One such case is *Padilla v. Kentucky*, 559 U.S. 356 (2010). There, the Supreme Court held that the Sixth Amendment requires attorneys to advise criminal defendants of the deportation consequences of guilty pleas. *Id.* at 360. Petitioners urge that these decisions, along with other recent developments in both state and federal law, provide viable avenues to reopen and challenge their removal orders. (*See, e.g.,* Dkt. 62 at 9.)

**D. Conditions in Detention**

While changed circumstances in Petitioners' lives and the law may provide meritorious grounds to challenge their removal orders, and while a few Petitioners have been able to quickly file motions to reopen once they were detained, many Petitioners have not been afforded this opportunity. In fact, the complex process of filing such a motion, coupled with the prohibitive conditions of detention, has made it very difficult for Petitioners to promptly file motions to reopen.

Filing a motion to reopen is a complicated and often prolonged process. The BIA may grant a motion to reopen removal proceedings pursuant to 8 C.F.R. § 1003.2(c). The motion "must be accompanied by the appropriate application for relief and all supporting documentation." 8 C.F.R. § 1003.2(c)(1). Filing motions to reopen therefore requires substantial time, resources, and expertise. (Dkt. 28-16 [Declaration of Martha Ruch, hereinafter "Ruch Decl."] ¶ 17.) Attorneys working to file these motions must have access to their clients and to various documents. (*Id.* ¶ 18.) These documents include, at

a minimum, the A-File, a comprehensive immigration file maintained by the Department of Homeland Security, and the Record of Proceedings, the immigration court file maintained by the Executive Office for Immigration Review. (Dkt. 28-15 [Declaration of Trina A. Realmuto] ¶ 9.) In some cases, attorneys can only obtain these necessary files through a Freedom of Information Act request, which may not produce results for months. (*Id.*)

It has been prohibitively difficult for many Petitioners to file motions to reopen while in detention. (Prasad Decl. ¶ 11.) Because Petitioners were detained abruptly and without notice, they do not have with them the critical documents to support their motions. (*Id.*; Ruch Decl. ¶ 18.) Attorneys attempting to work with Petitioners have faced an uphill battle. ICE officials initially denied attorneys access to visit Petitioners who had been detained in the October 2017 raids. (Ruch Decl. ¶ 12.) The officials would not provide information about who was being detained, why they were being detained, and when they would be available to consult with attorneys. (*Id.*) When attorneys have ultimately been able to meet with detained individuals, the attorneys were made to wait two to three hours before doing so. (*Id.* ¶ 14.)

Attorneys' attempts to maintain communication with their clients have been further frustrated by the constant relocation of Petitioners to different detention centers. (Prasad Decl. ¶ 13.) Many of the Petitioners detained in the October 2017 raids were first taken to detention centers in California. (Ruch Decl. ¶ 11.) Soon after, they were moved to detention centers in Louisiana, Arizona, Texas, and Seattle, before ultimately being sent back to California. (Prasad Decl. ¶ 13; Dkt. 28-3 [Declaration of Holly Cooper, hereinafter "Cooper Decl."] ¶¶ 4–11.) During these transfers, Petitioners have been forced to endure day-long bus rides and cross-country flights while shackled together like a chain gang. (Chhoeun Decl. ¶ 16.) These transfers have made it difficult for attorneys to contact, or even locate, their clients. (Cooper Decl. ¶¶ 4–11.)

Petitioners also claim that they have been subjected to inhumane and degrading conditions during their detention, including strip searches, meager meals, and denial of bathroom breaks. (Chhoeun Decl. ¶¶ 14, 17.) Petitioners apparently have been forced to stay in a freezing holding tank for eight hours and to sit outside on a cold night with their faces against a wall. (*Id.* ¶ 18.) Petitioners purportedly are not allowed to speak during meals, and violators of this rule have been forced to strip down to their underwear and sit outside during meals. (*Id.*)

Petitioners also report that Cambodian government officials have attempted to extort money and "gifts" from them and their families. After being detained, many Petitioners were transported to Louisiana to conduct interviews with the Cambodian consulate. (Dkt. 28-1 [Declaration of Jessica Castellanos, "Castellanos Decl."] ¶¶ 11–12.) During and after the interviews, Cambodian officials have promised to help prevent deportation if they gave the officials certain "gifts," including Rolex watches, designer perfume, cash, and iPhones. (Castellanos Decl. ¶¶ 12–13; Ruch Decl. ¶ 15; Dkt. 28-19 [Redacted Declaration No. 1] ¶¶ 12–14; Dkt. 28-20 [Redacted Declaration No. 2, hereinafter "Redacted Decl. 2"] ¶¶ 14–15.) The Cambodian officials have asked detainees for their family members' contact information to facilitate the bribes, and have in fact contacted family members to demand the "gifts." (*Id.*) The officials have also warned Petitioners that if they report these extortionate demands, they will face consequences when they are deported to Cambodia. (Redacted Decl. 2 ¶ 15.)

Many Petitioners have been foreclosed from filing motions to reopen in light of the administrative complexity of such motions, the inability to access counsel while being shuttled between various detention facilities, and the physical, emotional, and mental toll that detention has inevitably taken on them. In light of these obstacles, Petitioners request a brief stay of deportations until February 5, 2018, to give the individuals who

want to file motions to reopen that opportunity. Due process requires they be given this opportunity.

## III.  LEGAL STANDARD

A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (quotations omitted).

## IV.  DISCUSSION

### A.  Jurisdiction

The Government urges the Court to deny Petitioners injunctive relief and insists the Court lacks jurisdiction to decide whether due process entitles Petitioners to a stay of removal. The Court will address this threshold question of jurisdiction before addressing the merits of the preliminary injunction. "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (citation and quotations omitted). "Without jurisdiction the court cannot proceed at all in any cause." *Id*. (quoting *Ex parte*

*McCardle*, 7 Wall. 506, 514 (1868)). Where jurisdictions exists, however, "a federal court's obligation to hear and decide a case is virtually unflagging." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013) (citation and quotations omitted).

The Government claims that Congress unambiguously stripped this Court of jurisdiction over Petitioners' request when it enacted the 2005 REAL ID Act, 8 U.S.C. § 1252. The Government cites to specific provisions of the Act, namely sections 1252(a)(5), 1252(b)(9), and 1252(g), and argues that the statutory scheme clearly bars the Court from exercising jurisdiction in this case. Section 1252(a)(5) provides that, "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal." Section 1252(b)(9) provides that, "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." Finally, Section 1252(g) provides that, "[e]xcept as provided in this section . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

The Government's argument is not persuasive and is in clear contravention of controlling Ninth Circuit authority. The Ninth Circuit has, on a number of occasions, construed the provisions cited by the Government and has consistently held that district courts have jurisdiction when, as in this case, petitioners do not directly challenge their orders of removal, but rather assert a due process right to challenge the orders in the appropriate court. *See, e.g., United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) (the REAL ID Act was directed to impose judicial constraints upon prosecutorial discretion, and does not bar jurisdiction where the gravamen of the claim does not

challenge the Attorney General's discretionary authority to commence proceedings, adjudicate cases, or execute removal orders).

For example, in *Singh v. Gonzales*, 499 F.3d 969 (9th Cir. 2007), the Court held that Sections 1252(a)(5) and 1252(b)(9) of the REAL ID Act did not strip district court jurisdiction over petitioner's ineffective assistance of counsel claim in a habeas petition. The petitioner brought the petition after his counsel missed the thirty-day deadline to appeal an immigration judge's decision in the Ninth Circuit. *Id*. at 973. The petitioner was not challenging the merits of the immigration judge's decision in the district court, but merely sought to restart the thirty-day period to file a petition for review. *Id*. at 979. Given the nature of the requested relief, the Court held that the petition "cannot be construed as seeking judicial review of his final order of removal, notwithstanding his ultimate goal or desire to overturn that final order of removal." *Id*. Accordingly, the petition fell outside of the statutory provisions' jurisdictional bar, and the district court had jurisdiction to consider it. *Id*.

The Ninth Circuit has also rejected the argument that Section 1252(g) of the Act bars Petitioners from bringing due process claims to reopen their immigration proceedings. In *Walters v. Reno*, 145 F.3d 1032 (9th Cir. 1998), plaintiffs were immigrants who were accused of committing civil document fraud and were subsequently ordered removed. Plaintiffs alleged that the forms they received in connection with the document fraud charges did not adequately advise them of their rights, in violation of the due process clause, and sought, *inter alia*, injunctive relief to reopen their removal proceedings. *Id*. at 1037. The Ninth Circuit held that Section 1252(g) did not bar the district court's jurisdiction because the "claims do not arise from a decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien, but instead constitute general collateral challenges to unconstitutional practices and policies used by the agency." *Id*. at 1052

(citations and quotations omitted). The court explained that plaintiffs' "objective was not to obtain judicial review of the merits of their [immigration] proceedings, but rather to enforce their constitutional rights to due process in the context of those proceedings." *Id*. "Moreover, if the plaintiffs prevail on their claims, they will not be entitled to any substantive benefits; rather, they will only be entitled to reopen their proceedings." *Id*.

Contrary to the Government's assertion, the Court has jurisdiction to hear Petitioners' claims regarding due process violations and to order adequate injunctive relief. As in *Singh* and *Walters*, Petitioners do not seek review of the viability of their removal orders in the district court. In other words, Petitioners do not directly challenge the bases for their orders of removal. Instead, Petitioners seek an *opportunity* to challenge the removal orders. Petitioners merely request that their deportations be delayed until they can file motions to reopen and until they can avail themselves of the administrative system that exists to litigate meritorious motions to reopen. The relief Petitioners request will not entitle them to any substantive benefits; it is limited to "a day in court" to comport with due process. *See Singh*, 499 F.3d at 979.[2]

## B. Likelihood of Success on the Merits

Petitioners are likely to succeed on the merits of their claim that due process guarantees a meaningful opportunity to file and litigate motions to reopen before they are deported. (FAC ¶¶ 76–79.) It is "well established that aliens facing deportation from this country are entitled to due process rights under the Fifth Amendment." *Walters*, 145 F. 3d at 1037. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the

---

[2] Because the Court finds that the REAL ID Act does not bar jurisdiction, the Court declines to address the parties' dispute as to whether the REAL ID Act violates the Suspension Clause of the Constitution. *See Singh v. Gonzales*, 499 F.3d 969, 980 (9th Cir. 2007).

Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id*. at 333 (citations and quotations omitted). "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protections as the particular situation demands." *Id*. at 334 (citations and quotations omitted). To determine the procedural protections, the Court balances three factors: "(1) the private interest affected; (2) the risk of erroneous deprivation through the procedures used, and the value of additional safeguards; and (3) the government's interest, including the burdens of additional procedural requirements." *Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015) (citing *Mathews*, 424 U.S. at 335).

## 1. The Private Interest Affected

The liberty of Petitioners is undoubtedly at stake, and this interest cannot be trivialized. *Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom"). Many Petitioners have been living in the United States since they were small children, and have remained in this country for decades after they were ordered removed to Cambodia. They have grown up in our communities, obtained gainful and productive employment, and raised families of their own. For these Petitioners, being deported to Cambodia means starting their lives over in a foreign country and apart from their loved ones. Petitioners clearly have a strong liberty interest in remaining in this country. *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1068–69 (9th Cir. 1995) ("Aliens who have resided for more than a decade in this country . . . have a strong liberty interest in remaining in their homes.").

The Government asserts that Petitioners' liberty interest is weak, because Petitioners knew they were subject to removal orders and should have expected to be deported at any instant. The Government's argument is insensitive and ignores the strong ties that Petitioners have developed over the years in this country. When Petitioners were initially ordered removed to Cambodia, the Government was unable to carry out the deportations, determined that Petitioners did not pose a danger to society, and released them from custody to live at large in their communities for decades. It is disingenuous for the Government to claim that throughout the many years that Petitioners were permitted to live and work on supervised release, they should not have built up any expectation that they would be permitted to remain in the country. Petitioners should instead be commended for investing in and becoming productive members of our communities notwithstanding their removal orders. Because Petitioners did so, instead of wallowing in limbo while waiting to be deported, they have deepened their interest in remaining in this country. For the Government now to ignore Petitioners' strong ties and commitment to this country is deeply troubling.

## 2. The Risk of Erroneous Deprivation and Value of Safeguards

The exceptional circumstances at issue in this case create a high risk of erroneous deprivation absent a stay of deportations. The manner in which Petitioners were detained and the conditions of detention have made it prohibitively difficult for Petitioners with meritorious challenges to file motions to reopen. First, ICE officers rounded up Petitioners without any notice; Petitioners were detained without any explanation while in their homes, on their way to work, or during impromptu meetings with ICE. Petitioners were therefore unable to gather the necessary documents relating to their immigration and conviction histories to file motions to reopen. Once in detention, Petitioners have had very restricted access to attorneys. Attorneys have been made to wait hours before gaining any information about Petitioners or meeting with Petitioners,

and have not been able to access Petitioners while they are being transported to and from detention facilities around the country.

Notwithstanding these many obstacles, some Petitioners have been successful in consulting with attorneys and filing motions to reopen. For example, Petitioner Neth, with the help of his family, was able to contact counsel and vacate his removal order while in custody. But the record shows that, absent the Court's entry of a temporary restraining order, Neth may very well have been erroneously removed to Cambodia. According to Neth's counsel, Neth was scheduled to be deported on a flight scheduled for December 18, 2017, and he would have been on the flight but for the temporary restraining order. Even though Neth's counsel acted expeditiously to request a stay of Neth's deportation, he did not receive notice of the stay until December 21, 2017. The experience of Petitioner Neth reveals that even in the limited circumstances when Petitioners are able to expeditiously file motions to reopen, the haste with which the Government seeks to deport Petitioners creates a high risk of erroneous deprivations of liberty absent the Court's entry of injunctive relief.

The Government argues that the administrative procedures generally available to any individual seeking to challenge his or her removeability make it unlikely that Petitioners would be removed erroneously. The Government claims that these administrative procedures were available to Petitioners while Petitioners were on supervised release, and that Petitioners should have taken advantage of these procedures before they were re-detained by ICE. The Government further claims that because Petitioners essentially sat on their rights and did not avail themselves of the administrative procedures, any erroneous removals are self-inflicted.

The Government's argument is based on a number of unrealistic assumptions and evades the pertinent issue. Petitioners had been living undisturbed under supervised

release for decades, and reasonably concluded that removal, particularly imminent removal, was unlikely.  Moreover, until their recent re-detention, many Petitioners were not aware of the legal developments that could potentially nullify their removal orders.  Petitioners therefore had no compelling or urgent reasons, prior to their re-detention, to incur the significant time and expense of retaining counsel to file a motion to reopen.  *Hamama v. Adducci*, 261 F. Supp. 3d 820, 837–38 (E.D. Mich. 2017) (Petitioners, Iraqi nationals who had been living peaceably in their communities subject to removal orders for over a decade, "had little reason to suspect that the effort and cost of preparing a motion to reopen—up to $80,000 in a case of this nature—was necessary.").

At issue is not whether Petitioners were afforded sufficient procedural safeguards prior to their re-detention, when Petitioners had no notice that filing motions to reopen was necessary.  The relevant question is whether Petitioners are at risk of an erroneous deprivation of liberty *now*, if they are not afforded additional time to file and litigate motions to reopen.  The Court concludes that such a risk is likely and due process requires that Petitioners be given an opportunity to file their motions now that they are on notice and have compelling reasons to do so.

### 3.  The Governmental Interest

The relief that Petitioners seek does not materially impinge on the Government's interests.  The Government claims that the grant of an injunction here would incentivize every alien to file eleventh hour motions to stay and disrupt the removal system.  The Government also claims that granting stays of removal may cause travel documents to expire and require the Government to restart the removal process.

The Government's claims are overstated.  The Court's grant of injunctive relief here can hardly be construed as providing "every alien" an additional opportunity to file a

motion to stay. The Court's decision is based on the unusual circumstances Petitioners have faced since their removal orders were issued, including the significant passage of time and the abrupt manner in which ICE decided to re-detain Petitioners en masse. Moreover, the Government has provided no evidence that travel papers will actually expire if the relief Petitioners request is granted in this case. The Government has represented that the travel papers that have been issued to Petitioners are valid for 180 days, so the stay of deportations until February 5, 2018, will not cause any of the papers to expire. For those Petitioners whose motions to reopen are successful and whose immigration proceedings last longer than 180 days, it appears in all likelihood that those Petitioners' removal orders will be vacated and the Government will not have to restart removal proceedings for them. Simply put, the Government's concern about the expiration of travel papers is unfounded.

In reality, the Governmental interest at stake is minimal and amounts to a delay of a few weeks before it can begin deporting Petitioners. This minimal interest does not warrant a denial of Petitioners' due process rights.

## 4. The Procedural Protections

The scope of the injunctive relief that Petitioners seek is necessary to protect Petitioners' due process rights here. The extraordinary circumstances of this case—the long dormant removal orders, the changes in the law and in Petitioners' lives, the sudden and unexpected threat of deportation, and the barriers to accessing attorneys while in detention—have undermined Petitioners' ability to avail themselves of the administrative procedures to protect them from erroneous removals. To ensure that erroneous removals do not occur, Petitioners must be afforded sufficient time to file motions to reopen, and must be afforded judicial review of those motions before they are removed from this country. *Hamama*, 261 F. Supp. 3d at 839 ("Because an injunction pending adjudication

of the motions and the filing of petitions for review in the courts of appeals would allow for the requisite judicial review, its issuance is necessary to vindicate Petitioners' habeas rights."). The requested injunction will ensure that Petitioners have adequate time and opportunity to access the system that has been constructed to prevent erroneous removals; it is a system that includes the thorough exhaustion of an administrative process and judicial review by the appropriate court of appeals. The Court finds that the requested procedural protections are necessary to comport with due process.

### C. Irreparable Harm, Balance of Equities, and Public Interest

In addition to a likelihood of success on the merits, Petitioners must establish that they are likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tip in their favor, and the public interest favors granting the injunction. *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) (citing *Winter*, 555 U.S. at 20).

The Court has found that Petitioners are likely to succeed on their claim that removal without an opportunity to file and litigate motions to reopen constitutes a deprivation of Petitioners' due process rights. Further, "[i]t is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Id*. at 994. It logically follows that Petitioners have met their burden to establish a likelihood of irreparable injury. *Id*.

The equities also tip in Petitioners' favor. The Court has already determined that the Governmental interest at stake is minimal, and amounts to a brief delay of the deportations. The Government will not be required to restart the process of issuing travel papers for Petitioners, nor does the Government face any other risk to the integrity of the removal process. The minimal administrative costs to the Government are far

outweighed by the considerable harm to Petitioners' constitutional rights in the absence of the injunction. The injunction will also potentially prevent the unnecessary harm that would inevitably arise in the case of an erroneous removal, including Petitioners being forced to rebuild their lives in an unfamiliar country, far away from the ones they love and support.

The public interest also undoubtedly favors entry of a preliminary injunction. The injunction will serve the interests of the general public by ensuring that Petitioners' due process rights are not violated. *Hernandez*, 872 F.3d at 996 ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). The preliminary injunction is also in the interest of Petitioners' families and communities. The record contains substantial evidence indicating that removal of Petitioners would result in a significant emotional, psychological, and physical strain on their families and children, and that churches and workplaces would be deprived of Petitioners' support and active engagement.[3]

For these reasons, the Court finds that Petitioners face a likelihood of irreparable harm and the balance of equities and the public interest weigh in favor of granting the requested preliminary injunction.

//
//
//
//

---

[3] The Government's argument that the public's interest in the prompt execution of removal orders would be compromised by a preliminary injunction is belied by the Government's own conduct in this case. The Government has acted all but promptly to enforce the removal orders, and has instead permitted Petitioners to live at large in the United States for decades. The Government cannot now in good faith claim any interest in acting quickly to remove Petitioners to Cambodia.

# V. MOTIONS TO WITHDRAW

After the Court entered its temporary restraining order on December 14, 2017, seventeen individuals filed motions to withdraw, which are pending in this case.[4] (*See* Dkts. 42–45, 47–59.) The motions were filed on January 8, 2018, and are identical. (*Id.*) The motions state that each movant seeks to withdraw from the suit "where this court had grant [sic] an Injunctive Order preventing Immigration Customs and Enforcement ("ICE") from executing the plaintiff's order of removal to the country of Cambodia." (*See id.*) The motions further state that "[t]he plaintiff wish to be deported immediately and waive any rights he may have in re-opening his immigration case for relief." (*Id.*) It appears these motions were filed by individuals who believe they are class members in this case and who are currently being detained in a detention center in Sierra Blanca, Texas. It also appears that these individuals wish to be excluded from the preliminary injunction at issue.

Subsequently, Petitioners filed a statement of non-opposition to the motions to withdraw, (Dkt. 61), and the Government filed a statement of partial opposition, (Dkt. 67). Petitioners indicate that Petitioners' counsel endeavored to contact each of the movants to determine whether they consulted with attorneys before filing their motions. Petitioners represent that two of the movants, Theth Keth, (Dkt. 42), and Sokhan Khim, (Dkt. 48), are not class members because their current detention is the first time they have been in ICE custody. Petitioners also state that Petitioners' counsel have not been able to contact two of the movants, namely Lim Lok (Dkt. 43) and Khun Dum (Dkt. 45). As to the remaining thirteen movants, Petitioners' counsel have been informed that they consulted with an attorney and Petitioners have no opposition to their exclusion.

---

[4] An eighteenth motion to withdraw was filed by Saloeun Chea, (Dkt. 46), but Mr. Chea subsequently filed a motion to reinstate himself as a party in this case, (Dkt. 71). Mr. Chea's motion to reinstate is hereby **GRANTED** and his motion to withdraw is **DENIED AS MOOT**.

The Government indicates that it does not oppose the movants' request to be excluded from the preliminary injunction and to be removed to Cambodia. The Government opposes the motions, however, to the extent that they imply the Court has the authority to determine the rights of movants and to issue an injunction that covers putative class members. The Government suggests that the Court may grant an injunction that affects the rights of putative class members only after the Court certifies the class.

As an initial matter, the Court rejects the Government's contention that putative class members are not entitled to enjoy the benefits of a preliminary injunction before the class is certified. By their very nature, preliminary injunctions are properly entered in emergency situations to enjoin imminent, irreparable harm. The impending irreparable harm at issue may very well require entry of a preliminary injunction before the parties can engage in the lengthy process of gathering evidence and submitting arguments in support of a motion for class certification. There is no authority that suggests putative class members are not entitled to any injunctive relief while they await class certification.

The only authority the Government cites in support, *Zepeda v. U.S. I.N.S.*, 753 F.2d 719 (9th Cir. 1983), is inapposite. *Zepeda* only stands for the proposition that after a motion to certify a class was expressly denied, the court was limited to entering an injunction only as to the individual plaintiffs. *Id*. at 727. *Zepeda* does not apply where, as here, an injunction is necessary to forestall harm to putative class members that is likely to transpire before the parties can litigate a motion for class certification. *Just Film, Inc. v. Merch. Servs*., Inc., 474 F. App'x 493, 495 (9th Cir. 2012) ("We do not read *Zepeda* to preclude our result because in *Zepeda* the trial court had denied class certification and here the trial court has not yet decided the class certification issue.").

The Court therefore holds that the preliminary injunction shall extend to the subset of 92 putative class members who are subject to travel orders or are expected to receive travel orders. If any of the seventeen movants belong in this subset, the movant's motion to withdraw is **GRANTED** and the movant shall be excluded from the preliminary injunction.

## VI.  CONCLUSION

For the foregoing reasons, Petitioners' request for injunctive relief is **GRANTED**. A preliminary injunction will issue concurrent with this order.

DATED:     January 25, 2018

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE