1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                     **CENTRAL DISTRICT OF CALIFORNIA**

10                          **SOUTHERN DIVISION**

11

12                                            ) **Case No.: SACV 17-01898-CJC(GJSx)**
                                              )
13   **NAK KIM CHHOEUN AND MONY**             )
                                              )
14   **NETH, individually and on behalf of a** )
     **class of similarly situated individuals,** )
15                                            ) **ORDER DENYING THE**
                                              ) **GOVERNMENT'S MOTION TO**
16                **Petitioners,**            ) **DISMISS AND GRANTING RELIEF**
                                              ) **ON UNLAWFUL DETENTION**
17         **v.**                             ) **CLAIMS**
                                              )
18                                            )
     **DAVID MARIN, DAVID JENNINGS,**         )
19   **THOMAS HOMAN, ELAINE DUKE,**           )
     **JEFFERSON SESSIONS III, SANDRA**       )
20   **HUTCHENS, AND SCOTT JONES,**           )
                                              )
21                                            )
                                              )
22                **Respondents.**            )
                                              )
23                                            )
                                              )
24   _____ )

25

26   //

27   //

28   //

# I. INTRODUCTION

Petitioners Nak Kim Chhoeun and Mony Neth bring this habeas petition on behalf of themselves and a putative class of Cambodian nationals who were abruptly rounded up by immigration officials, detained, and threatened with imminent deportation.[1] Petitioners were living and working peaceably in their communities for many years before immigration officials suddenly took them from their homes in October 2017. Petitioners were not given any notice of their detention or an opportunity to contest their deportation to Cambodia.

Petitioners challenge the Government's conduct as a violation of due process and seek relief from detention.[2]  Petitioners bring the following claims for relief in their habeas petition: (1) unlawful revocation of release, (2) violation of procedures for revocation of release, (3) unlawful detention where removal is not reasonably foreseeable, (4) unlawful detention without individualized determinations of danger and flight risk, and (5) unlawful removal without due process guaranteed by the Constitution. (*See generally* Dkt. 27 [First Amended Habeas Corpus Petition and Complaint, hereinafter "FAC"].)

The Government has moved to dismiss Claims One, Two, and Five, primarily for lack of jurisdiction.  The Government's motion is **DENIED**, as the Court has jurisdiction over Petitioners' habeas petition and can properly consider whether their due process rights have been violated.

---

[1] For purposes of this Order, "Petitioners" refers only to the two named Petitioners, Nak Kim Chhoeun and Mony Neth.

[2] "The Government" refers to Respondents David Marin, Field Office Director, Los Angeles Field Office, United States Immigration and Customs Enforcement; David Jennings, Field Office Director, San Francisco Field Office, United States Immigration and Customs Enforcement; Kirstjen Nielsen, Secretary of the Department of Homeland Security; and Jefferson Sessions III, United States Attorney General.

The Government has also filed a return on Claims Three and Four, and Petitioners have traversed.  The Government seeks a dismissal of these habeas claims, while Petitioners seek an order declaring their detention unlawful and an order of release for Chhoeun.  The Court finds, based on the record before it, that Chhoeun's abrupt arrest, detention and threatened deportation were unlawful.  Accordingly, Chhoeun's request for habeas relief is **GRANTED**.

## II.  BACKGROUND

Petitioners Nak Kim Chhoeun and Mony Neth filed this action seeking a writ of habeas corpus on behalf of themselves and a putative class of Cambodian nationals who have been detained in raids conducted by United States Immigration and Customs Enforcement ("ICE").  Petitioners were on supervised release and living peaceably in their communities when they were abruptly detained, without any notice, in October 2017.  Petitioners are among approximately 100 Cambodian nationals who were rounded up and detained around the same time.

Petitioners then learned in December 2017 that ICE intended to deport them within days.  Petitioners believe that ICE detained and seeks to deport them with unprecedented speed, not because anything has changed in their personal circumstances, but because the Government wishes to put pressure on Cambodia to facilitate U.S. removal efforts. Petitioners contend this conduct deprived them the right to contest their removal orders in the appropriate courts and amounts to a denial of due process.

### A.  Procedural History

Petitioners brought this action on October 27, 2017, soon after ICE arrested and detained them without notice.  (Dkt. 1 [Complaint]; *see also* FAC.)  In early December

2017, after Petitioners had been detained for approximately two months, they learned that the first flight to Cambodia was scheduled for the morning of December 18, 2017, and that the Government planned to complete removals by the end of that month. (Dkt. 28 at 1.) In light of the imminent removals, Petitioners filed an application for a temporary restraining order on December 12, 2017, asking the Court to stay deportations for approximately 60 days until February 5, 2018. (*See generally id.*) Petitioners explained that this additional, limited time was necessary to give those who wanted to file motions to reopen their removal orders an opportunity to do so. (*Id.*)

The Court granted the temporary restraining order on December 14, 2017, and ordered the Government to show cause why a preliminary injunction should not be issued. (Dkt. 32.) After additional briefing and evidence submitted by the parties, the Court entered a preliminary injunction on January 25, 2018, enjoining deportations until February 5, 2018, to afford detainees an opportunity to file motions to reopen. (Dkt. 75.) For detainees who filed a motion to reopen by February 5, 2018, their removals were enjoined for an additional, limited period to adjudicate motions to stay their removals before the appropriate courts. (*Id.*)

**B. Nak Kim Chhoeun**

Petitioner Chhoeun was born in Cambodia in 1975 and entered the United States with his family in 1981. (Dkt. 28–2 [Declaration of Nak Kim Chhoeun, hereinafter "Chhoeun Decl."] ¶ 2.) Chhoeun's family was sponsored as refugees fleeing the Khmer Rouge regime. (*Id.*) Today, all of his living family members, his mother and six siblings, are U.S. citizens. (*Id.*) In 1999, Chhoeun was convicted in Pennsylvania state court of crimes involving firearms and simple assault. (*Id.* ¶ 5.) In 2002, an immigration judge issued an order of removal for Chhoeun based on his criminal convictions. (*Id.* ¶ 7.) From January 2003 to November 2003, Chhoeun was detained while ICE waited for

Cambodia to issue travel documents.  (*Id*.)  The travel documents were never issued, so ICE was unable to deport him.  (*Id*.)  Chhoeun ultimately filed a habeas petition to be released from detention, and on November 25, 2003, he was ordered released by the United States District Court of the Eastern District of Louisiana.  (*Id*. ¶¶ 7–8; Dkt. 86-1.)

For fourteen years following his release, Chhoeun duly complied with the conditions of his release and has had no convictions or arrests.  (Chhoeun Decl. ¶ 8.) Also in that time, Chhoeun has been gainfully employed, most recently at AT&T, and has been an integral member of his family and community.  (*Id*. ¶¶ 9–11.)  Since Chhoeun's father passed away in 2004, he would visit his mother, who suffers from several medical conditions and disabilities, on a daily basis.  (*Id*. ¶ 11.)  His mother describes Chhoeun as a son who is "always here for me when I need help with anything," and who can "always make everyone laugh and happy."  (Dkt. 86-2 [Declaration of Martha Ruch] Ex. B [Compendium of Twenty-Three Letters of Support from Chhoeun's Friends and Family].)  Chhoeun's siblings describe him as "a changed person," "a hard worker always striving to succeed in life," "family oriented," a "role model," and "having a strong demeanor to keep the family close."  (*Id*.)  Chhoeun's friends describe him as "a sweet and caring person," "the kind of person who would give the shirt off his back to anyone who was in need," "loving and compassionate," "a brother to me and an uncle to my children," and "a man of great integrity."  (*Id*.)

On October 14, 2017, after fourteen years of being on release, Chhoeun received a letter indicating that he should report to the local ICE office.  (Chhoeun Decl. ¶ 13.)  The letter did not explain why he was required to report or whether his release would be revoked.  (*Id*.)  When Chhoeun reported to ICE, he was detained without any explanation or notice.  (*Id*.)  Chhoeun remains in detention to this day, five months later.

Since being detained, Chhoeun has become severely depressed and has experienced a loss of appetite and feelings of hopelessness.  (Dkt. 86-7 [Supplemental Declaration of Nak Kim Chhoeun] ¶ 6.)  He describes the conditions of his detention as bleak, as there is little to occupy his time and he feels like a prisoner.  (*Id*.)  On February 5, 2018, while in detention, Chhoeun filed a motion to reopen his immigration case before the Board of Immigration Appeals.  (*Id*. ¶ 3.)  He continues to inquire into the status of his immigration case and whether Cambodia has issued his travel papers, but has received no updates.  (*Id*. ¶ 11.)

## C.  Mony Neth

Petitioner Neth was born in Cambodia in 1975 and entered the United States with his family in 1985, fleeing the Khmer Rouge regime.  (Dkt. 28-9 [Declaration of Mony Neth, hereinafter "Neth Decl."] ¶¶ 2–4.)  Neth lives in Modesto, California with his wife, sixteen-year-old daughter, and parents, all of whom are U.S. citizens.  (*Id*. ¶ 3.)  In 1995, Neth was convicted of unlawful possession of a weapon and receipt of stolen property.  (*Id*. ¶ 4.)  In 1997, ICE detained Neth for removal proceedings based on his criminal convictions.  (*Id*. ¶ 5.)  Shortly after, ICE determined that Neth did not pose a danger or a flight risk and released him on supervised release.  (*Id*.)

In the past twenty years, Neth has complied with the conditions of his release and has not been charged with any additional crime.  (*Id*.)  Instead, Neth has built a family, is gainfully employed by a solar energy company, and is an active member of his local church.  (*Id*. ¶¶ 5, 12.)  Through his church, Neth regularly serves meals to the homeless.  (*Id*. ¶ 12.)

//
//

On July 28, 2017, the Stanislaus County Superior Court granted Neth a Certificate of Rehabilitation for his 1995 convictions.  (*Id*. ¶ 13; Dkt. 28-12 [Declaration of Anoop Prasad, hereinafter "Prasad Decl."] Ex. B.)  To support the finding of rehabilitation with satisfactory proof, the Superior Court and the District Attorney's office completed a full investigation and hearing.  (*Id*.)  The Superior Court found that Neth "has demonstrated by the course of conduct [his] rehabilitation and fitness to exercise all the civil and political rights of citizenship."  (*Id*.)

On October 20, 2017, ICE officers stopped and arrested Neth while he was driving to work.  (Neth Decl. ¶ 9.)  Neth received no notice or explanation why he was being detained.  (*Id*. ¶ 10.)  Neth's family learned he was being detained only after the fact, when an ICE officer drove Neth's car to his home and handed his wife the keys.  (Dkt. 28-7 ¶ 13.)

On December 6, 2017, while Neth was in custody, the Governor of California granted Neth a full and unconditional pardon.  (Prasad Decl. Ex. A.)  In his pardon, the Governor stated that since his convictions, Neth "has lived an honest and upright life, exhibited good moral character, and conducted himself as a law-abiding citizen."  (*Id*.)  The pardon allowed Neth to reopen his immigration proceedings and file a motion for stay of removal, which he filed on December 13, 2017.  (Dkt. 62-6 ¶ 6.)  On December 21, 2017, Neth learned that the Board of Immigration Appeals had granted the stay.  (*Id*. ¶¶ 7–11.)  On December 22, 2017, ICE released Neth from detention on an order of supervision pending the outcome of his removal proceedings.  (Dkt. 60 at 4–5.)

//
//
//
//

# III.  ANALYSIS

The Government moves to dismiss Claims One, Two, and Five under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction.  (Dkt. 80 ["Mot."].)  The Government also argues that Claim One should be dismissed under Rule 12(b)(6) for failure to state a claim.  (*Id.*)  In addition, the Government filed a habeas return on Claims Three and Four, (*id.*), and Petitioners filed a traverse in response, (Dkt. 86 ["Opp."]).

## A.  Subject Matter Jurisdiction

The Government moves to dismiss the following claims for lack of subject matter jurisdiction: Claim One for unlawful revocation of release, Claim Two for violation of procedures for revocation of release, and Claim Five for unlawful removal without due process guaranteed by the Constitution.  (Mot. at 11.)  Petitioners urge the Court to deny the Government's motion and assert that the Court has traditional habeas jurisdiction over these claims.  (Opp. at 7–8.)  The Court agrees with Petitioners.

As an initial matter, the Court already ruled that it has jurisdiction over Petitioners' claims when it issued the preliminary injunction.  (*See* Dkt. 74 at 15–18.)  Yet, the Government raises the same arguments it raised then to challenge the Court's jurisdiction here.  The Government's main contention is that the 2005 REAL ID Act, 8 U.S.C. § 1252, which Congress enacted to restrict judicial review of certain immigration decisions, strips the district courts of jurisdiction over Petitioners' claims.

The Government invokes certain provisions of the Act, including Sections 1252(a)(5), 1252(b)(9), and 1252(g).  Section 1252(a)(5) provides that, "a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal."  Section 1252(b)(9) provides that,

"[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."  Finally, Section 1252(g) provides that, "[e]xcept as provided in this section . . . no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

The Government argues that these provisions, taken together, bar the district courts from considering any issue related to Petitioners' removal, including due process challenges to their re-detention.  (Mot. at 14.)  The REAL ID Act does not sweep so broadly, however.  Instead, the Supreme Court and the Ninth Circuit have consistently construed the Act narrowly to preclude district courts' jurisdiction only where the claim challenges "the Attorney General's discrete acts of commencing proceedings, adjudicating cases, and executing removal orders—which represent the initiation or prosecution of various stages in the deportation process."  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 487 (1999) (quotation marks omitted); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (the Act restricts judicial review of only the three specific actions to commence proceedings, adjudicate cases, or execute removal orders).  In other words, the jurisdiction stripping provisions are "directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion."  *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 485 n.9.  The Act therefore restricts district court review over claims contesting the merits or validity of a removal order.  *See Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007) ("By virtue of their explicit language, both §§ 1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of orders of removal.").

The REAL ID Act does not strip district court jurisdiction over Petitioners' claims because they do not challenge the Attorney General's discretionary authority over removal proceedings.  Instead, Petitioners challenge the manner in which they were re-detained—without any notice or changed circumstances warranting their detention—and the subsequent threat of imminent removal as violations of their constitutional due process rights.  This Court undoubtedly has jurisdiction over such claims, which do not challenge any final order of removal, but rather challenge ICE's conduct in rounding up Petitioners and attempting to deport them before they could challenge their removal orders in the appropriate courts.  *See Flores-Torres v. Mukasey*, 548 F.3d 708, 711 (9th Cir. 2008) (the jurisdiction stripping provisions of the REAL ID Act do not apply to a habeas petition that does not challenge any final order of removal but challenges detention prior to the issuance of a final order).

It is clear that "post-[REAL ID Act], aliens may continue to bring collateral legal challenges to the Attorney General's detention authority—such as in this case—through a petition for habeas corpus."  *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 946 (9th Cir. 2008); *see also Nadarajah v. Gonzales*, 443 F.3d 1069, 1075 (9th Cir. 2006) ("By its terms, the jurisdiction-stripping provision does not apply to federal habeas corpus petitions that do not involve final orders of removal.")  As the Supreme Court recently found, "cramming judicial review" of individuals' injuries arising out of detention "into the review of final removal orders would be absurd."  *Jennings*, 138 S. Ct. at 840.  To avoid such an absurd result, the Court finds that it has jurisdiction over Petitioners claims under the federal habeas corpus statute, 28 U.S.C. § 2241.  *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (habeas remains "the basic method for obtaining review of continued custody" after a removal order is final).[3]

---

[3] The Government also argues that the Court lacks jurisdiction based on 8 U.S.C. § 1231(h).  This argument is without merit.  Section 1231(h) merely bars courts from construing Section 1231 as creating any enforceable right or benefit.  *Zadvydas*, 533 U.S. at 688.  Section 1231 does not apply because

## B.  Failure to State a Claim

With respect to only Claim One, the Government moves to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  In Claim One, Petitioners seek relief for the unlawful revocation of their release.  (*See* FAC ¶¶ 53–57.)  In support of their claim, Petitioners allege that they were originally detained many years ago when their removal orders were issued, but were subsequently released when Cambodia would not accept their repatriation.  (*Id*. ¶ 54.)  Petitioners further allege that while they were on release they were subject to certain conditions, and the Government could only revoke their release under certain changed circumstances.  (*Id*. ¶ 55.)  According to Petitioners, they consistently complied with the conditions of their release, yet the Government arbitrarily and without notice revoked their release and re-detained them in October 2017.  (*Id*. ¶ 56.)  Petitioners claim that the revocation of their release and re-detention violated their constitutional right to due process and, accordingly, seek immediate release from custody.  (*Id*. ¶ 57.)

Petitioners have sufficiently stated a habeas claim that their release was unlawfully revoked in violation of their constitutional right to due process.  The factual allegations detail how they were abruptly re-detained by the Government without notice and an opportunity to challenge their removal orders in the appropriate courts.  The allegations therefore state a viable action for a writ habeas corpus, which "traditionally has been accepted as the specific instrument to obtain release from unlawful confinement." *Wilkinson v. Dotson*, 544 U.S. 74, 79 (2005) (citation and quotation marks omitted).

*//*

*//*

---

Petitioners do not bring any claims under that section.  Consequently, Section 1231(h)'s bar is irrelevant to this case.

### C.  Habeas Return on Petitioners' Unlawful Detention Claims

In Claims Three and Four, Petitioners allege their re-detention was unlawful as a violation of due process.  (FAC ¶¶ 64–75.)  Petitioners allege that they were ordered removed many years ago, but were released from ICE custody because they could not be repatriated.  (*Id*. ¶ 67.)  Petitioners further allege that their release was suddenly revoked without any opportunity to challenge their detention or their removal orders in the appropriate court.  (*Id*. ¶ 74.)  Petitioners claim these actions violated their constitutional due process rights and seek immediate release from detention.  (*Id*. ¶¶ 70, 71, 73.)

The Government does not raise jurisdictional challenges or pleading defects against these unlawful detention claims, but has filed a "habeas return" and argues for the claims' dismissal on the merits.  (Mot. at 21–25.)  In response, Petitioners filed a traverse on the habeas return and urge the Court to grant their request for relief and order Chhoeun released.  (Opp. at 14.)[4]

The Government's abrupt arrest and detention of Chhoeun without notice violated his right to due process.  Chhoeun has been living in the United States since 1981, when he fled Cambodia as a child refugee.  All of Chhoeun's living relatives, his mother and six siblings, are U.S. citizens.  Almost two decades ago, Chhoeun was convicted of state crimes and ordered removed based on those convictions.  His removal could not be executed, however, and in November 2003 he was ordered released from detention.

Since his release, for fourteen years, Chhoeun was permitted to carry on with his life, become gainfully employed, and build strong ties to his family and community.  The

---

[4] It is not necessary for the Court to consider whether Petitioner Neth is also entitled to relief on these claims and order him released, as he was already released on December 22, 2017, and is not currently in custody.

many letters submitted in support of Chhoeun describe him as a pillar of his family, an upstanding and productive worker, and a valued friend.  Also in the past fourteen years there has been no evidence that Chhoeun is a danger or flight risk.  Chhoeun has not been arrested for or convicted of any additional crime, and he has consistently complied with ICE's orders and the conditions of his release.  Chhoeun has, and would again, appear for removal proceedings when called to do so.

Yet, on October 14, 2017, ICE suddenly revoked Chhoeun's release, separated him from his family and community, and placed him in detention without any notice or explanation.  ICE had planned to deport Chhoeun to Cambodia without giving him any opportunity to challenge his removal order before the Board of Immigration Appeals.  As the Court noted previously in its order preliminarily enjoining ICE from deporting Petitioners, however, Chhoeun must be given an opportunity to raise meritorious grounds to challenge his removal order.  Inexplicably, the Government gave Chhoeun no process, let alone due process, when it abruptly detained him to deport him to Cambodia.  Indeed, Chhoeun was not even provided the minimal safeguard of notice and a chance to say goodbye to his family, to notify his employer, or to contact an attorney.  Sadly, ICE's actions deprived Chhoeun of his liberty in blatant violation of his constitutional right to due process.

It is "well established that aliens facing deportation from this country are entitled to due process rights under the Fifth Amendment."  *Walters v. Reno*, 145 F.3d 1032, 1037 (9th Cir. 1998).  The Supreme Court has "emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (citations and quotations omitted).  "[T]he Due Process Clause was intended to prevent government

officials from abusing their power, or employing it as an instrument of oppression." *Id*. at 846 (citations and quotations omitted).

The Court already found, when it granted the preliminary injunction, that due process requires Chhoeun be given an opportunity to reopen his removal proceedings before deportation. (*See* Dkt. 74 at 19–24.)  And that same due process now demands that Chhoeun be released pending the resolution of his motion to reopen.  Chhoeun poses no danger to the community.  Prior to ICE's wrongful re-detention of him, he was living peaceably in the community for the past fourteen years.  He was gainfully employed.  He had built strong ties to his family and his community.  The Government simply had no justification to take away, without due process, Chhoeun's liberty to carry out his life. *See Zadvydas*, 533 U.S. at 690 (freedom from government custody lies at the heart of the due process liberty interest).  And the Government also has no justification for continuing to detain him pending his motion to reopen before the Board of Immigration Appeals.

The Government somehow argues that due process does not require any "orderly process" before Chhoeun is detained and removed. (Mot. at 10.)  The Government's position is that once an individual is subject to an order of removal, the Government may detain and deport that individual without any process—regardless of the passage of time since the order was issued, the individual's ties to the community, and the significant liberty interests at issue. (*Id*. at 10–12.)  The Government's argument trivializes, indeed ignores, fundamental principles of liberty and due process embedded in our Constitution. Liberty—not merely freedom from physical restraint, but the right to work, establish a home, and surround ourselves with friends and family—encompasses all of the privileges "essential to the orderly pursuit of happiness." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).  And due process demands that the Government consider the totality of an individual's circumstances before taking away his or her liberty. *Ragbir v. Sessions*, 2018 WL 623557, at \*2 (S.D.N.Y. Jan. 29, 2018) ("[I]f due process means anything at

all, it means that we must look at the totality of circumstances and determine whether we have dealt fairly when we are depriving a person of the most essential aspects of life, liberty, and family.")  Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (citation and quotations omitted).  The Government's position, which would do away with any individualized consideration before taking away someone's liberty, is repugnant to due process.

For fourteen years after his removal order was issued, Chhoeun was permitted to live and work without incident in the community.  The Government must permit him to continue doing so pending his challenge to his removal order.

## IV.  CONCLUSION

For the foregoing reasons, the Government's motion to dismiss is **DENIED**. Chhoeun is **GRANTED** relief on Claims Three and Four of the First Amended Habeas Corpus Petition.  It is hereby **ORDERED** that Chhoeun be immediately released from custody and placed on supervision under the same terms and conditions imposed on him prior to his unlawful detention.  Chhoeun is ordered to report to ICE at **300 N. Los Angeles St, Room 2204, Los Angeles, CA 90012**, within ten days of the date of this Order to receive an order of supervision.

DATED:      March 26, 2018

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE