1
2
3
4
5
6
7

8            **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10                  **SOUTHERN DIVISION**

11

12  **NAK KIM CHHOEUN AND MONY**          )   **Case No.: SACV 17-01898-CJC(GJSx)**
    **NETH, individually and on behalf of a**  )
13  **class of similarly situated individuals,** )
                                               )
14                                             )
                                               )
15              **Petitioners,**               )   **ORDER GRANTING PETITIONERS'**
                                               )   **MOTION FOR SUMMARY**
16        **v.**                               )   **JUDGMENT [Dkt. 250] AND**
                                               )   **DENYING RESPONDENTS' CROSS-**
                                               )   **MOTION FOR SUMMARY**
17  **DAVID MARIN, Field Office Director,**    )   **JUDGMENT [Dkt. 298]**
    **Los Angeles Field Office, United States** )
18  **Immigration and Customs Enforcement;**  )
    **DAVID W. JENNINGS, Field Office**        )
19  **Director, San Francisco Field Office,**  )
    **United States Immigration and Customs**  )
20  **Enforcement; MATTHEW ALBENCE,**         )
    **Acting Director, United States**         )
21  **Immigration and Customs Enforcement;**  )
    **KEVIN MCALEENAN, Acting**               )
22  **Secretary, United States Department of** )
    **Homeland Security; WILLIAM BARR,**      )
23  **United States Attorney General,**        )
                                               )
24                                             )
25              **Respondents.**               )
                                               )
26                                             )
                                               )
27

28

# I.     INTRODUCTION

The United States Constitution protects all persons present in this country—whether lawfully or unlawfully, temporarily or permanently—from governmental abuse of power.  One right it guarantees is the right to due process of law before the government takes away a person's right to live, work, and raise a family in the United States.  Petitioners here seek to enforce that right.  As they phrase it, they "seek the most basic form of due process prior to loss of the most fundamental liberty interest:  written notice prior to detention for the purpose of removal from their homes, lives, and families."  (Dkt. 250 at 1.)

Petitioners Nak Kim Chhoeun and Mony Neth represent a certified class of around 900 Cambodian nationals living in the United States.  (*See* Dkt. 149 at 16 [class definition]; Dkt. 315 ¶ 1.)  Many class members fled Cambodia in the 1970s as small children to escape the brutal Khmer Rouge regime.  Although they have been living in the United States for many years, most class members are subject to orders of removal to Cambodia based on criminal convictions that are years or decades old.  The government did not deport them when the orders of removal were issued because Cambodia refused to accept their repatriation.  Instead, ICE released them from custody and returned them to their families and communities.  In the decades since their release, class members have remained in this country and served as peaceable and productive members of our society, not committing any additional crimes or violating any conditions of release, and their removal orders laid dormant.

In October 2017, ICE suddenly commenced a series of raids to detain Petitioners.  Without warning, armed ICE officers raided Petitioners' homes and workplaces, taking them away from their communities, families, and responsibilities.  Some Petitioners were detained at ICE offices when they reported for what they assumed were perfunctory

meetings.  Others were detained after being pulled over while driving to work.  The government conducted similar raids without notice in spring and fall 2018.  Until this Court issued orders requiring notice, the government conducted raids without giving Petitioners any notice at all that they would be suddenly detained after years of release.  Absent this litigation, the government would have removed them without any notice and opportunity to be heard beyond what they received decades ago (in some cases, before critical changes in the law) in connection with the issuance of their removal orders.  Indeed, the government did not even give them the opportunity to say goodbye to their families and loved ones.

Now before the Court are cross motions for summary judgment on the issue of whether procedural due process requires the government to provide written notice to Petitioners before re-detaining them for removal procedures.  (*See* Dkt. 250 [Petitioners' Motion for Summary Judgment, hereinafter "Mot."]; Dkt. 298[1] [Respondents' Cross-Motion and Opposition, hereinafter "Cross Mot."].)  For the following reasons, the Court finds that the Constitution mandates notice under these circumstances.  Accordingly, Petitioners' motion is **GRANTED** and Respondents' cross-motion is **DENIED**.

## II.    BACKGROUND

### A. The Named Petitioners' and Other Class Members' Background

#### 1.    Nak Kim Chhoeun

Petitioner Nak Kim Chhoeun was born in Cambodia in 1975.  (Dkt. 28-2 [December 2017 Declaration of Nak Kim Chhoeun, hereinafter "2017 Chhoeun Decl."]

---

[1] The government filed three versions of the same motion, to account for factual errors in old versions and this Court's order denying their request to file a 50-page motion (Dkt. 282).  Accordingly, this order also resolves the motions at Docket Numbers 284 and 292.

¶ 2.)  His mother survived the Khmer Rouge, though many in her family were killed, including both her parents.  (*Id.* ¶ 11.)  Mr. Chhoeun fled Cambodia with his parents and siblings when he was just three years old, and spent time in refugee camps in Thailand and in the Philippines.  (*Id*. ¶ 2.)  The family entered the United States in June 1981, when Mr. Chhoeun was about six years old.  (*Id*. ¶ 3.)  Mr. Chhoeun is now 44 years old, and his parents and six siblings are now all U.S. citizens.  (*Id*. ¶ 2.)

Sometime around 1999, when Mr. Chhoeun was in his early 20s, he was involved in a gang-related incident.  (*Id*. ¶ 4.)  The incident occurred when Mr. Chhoeun agreed to drive his friend's brother to run an errand.  (*Id*.)  Although Mr. Chhoeun did not know it at the time, the neighborhood they drove into had a reputation for being dangerous.  (*Id.*)  When they arrived, people approached his car and threw bottles at it.  (*Id*.)  Mr. Chhoeun tried to drive away, but his friend's brother pulled out a gun and shot at a parked car.  (*Id*.)  No one was injured and police were not called to the scene.  (*Id*.)

Mr. Chhoeun later learned that the individuals who approached his car were gang members.  (*Id*.)  When police questioned the gang members, they learned of Mr. Chhoeun's involvement.  (*Id*.)  Based on the information gathered by the police, the District Attorney pressed charges against Mr. Chhoeun, although the record does not make clear the precise nature of the charges or their disposition.  (*See id.*)  Mr. Chhoeun states in his declaration that he went to trial for at least some of the charges, and that although a jury convicted him, he was ultimately acquitted on appeal.  (*Id*.)  Mr. Chhoeun further claims that while his appeal was pending, he learned that there were additional charges filed against him for possession of a firearm and simple assault—charges he knew nothing about until the District Attorney offered him a plea deal.  (*Id*.)  He claims that there were no hearings regarding these charges and that he did not know any of the facts alleged, including the identity of the purported victim.  (*Id*.)  Mr. Chhoeun nevertheless accepted a plea agreement of a concurrent two-year sentence.  (*Id*.)  He later

received an order of removal from an immigration judge.  (*Id.* ¶ 7.)  He was placed in ICE custody pending deportation, but was released after six months because Cambodia would not accept his repatriation.  (*Id.*)

Mr. Chhoeun lived on an ICE order of supervision from December 2003 through October 2017.  (*See id.* ¶ 8.)  In those nearly 14 years, he had no convictions or arrests, complied with the conditions of his release, and served as a productive member of his workplace, family, and community.  (*See id.* ¶¶ 8–9.)  He became gainfully employed in 2004 and remained so until his detention.  (*Id.* ¶ 9.)  In 2014, he became a service technician for AT&T, and in 2016, he received the highest accolade available to the 275 such technicians A&T employs—technician of the year.  (*Id.*)  Mr. Chhoeun is also a key decisionmaker in his family, and in 2004 was called on to decide whether to remove his father from life support.  (*Id.* ¶ 10.)  After his father passed away in 2004, Mr. Chhoeun visited his mother every day.  (*Id.* ¶ 11.)  These visits were necessary because his mother, whose own parents and other family members were killed by the Khmer Rouge regime, suffers from several medical conditions and disabilities.  (*Id.*)  Mr. Chhoeun also extended hospitality to other members of the community.  For example, when he learned that a former colleague had become homeless, Mr. Chhoeun housed him (despite the fact that Mr. Chhoeun lived in a studio apartment) and helped him get a job.  (*Id.* ¶ 12.)  With Mr. Chhoeun's help, the colleague was able to regain employment and his own place to live.  (*Id.*)

On October 14, 2017, after nearly 14 years of supervision, Mr. Chhoeun received a letter stating that he should report to the local ICE office.  (*Id.* ¶ 13.)  The letter did not explain why he was required to report, but because the date ICE asked Chhoeun to report was three days away from his regular check-in date, Chhoeun believed he was reporting for a regular check-in and thought little of the letter.  (Dkt. 251-1, Ex. 1 [hereinafter "Chhoeun Depo."] at 42–43.)  Indeed, on the date in the letter, Mr. Chhoeun checked in

and followed the same procedure he followed for ordinary check-ins.  (*Id.* at 44.)  He put a form in a box, his name was called, he went through a door, and an officer met him there.  (*Id.* at 45.)  But where usually the officer would give him a new date to report, this time the officer told Mr. Chhoeun to "sit tight."  (*Id.*)  Mr. Chhoeun waited thirty minutes.  (*Id.*)  Then, someone else came in the room, told Mr. Chhoeun to put his hands behind his back, and handcuffed him.  (*Id.*)  He was put in a holding tank for eight to ten hours, shackled, and taken away to a maximum-security jail complex.  (*Id.* at 46.)

On March 26, 2018, the Court granted Mr. Chhoeun habeas relief on his unlawful detention claim, finding that the government's abrupt arrest and detention of him without notice violated his right to due process, and ordered that he be immediately released from custody and placed on supervision under the same terms and conditions imposed on him prior to his unlawful detention.  (Dkt. 104 at 12, 15.)  He is currently pursuing judicial review of his motion to reopen in the Third Circuit, and is also seeking a pardon in the state of Pennsylvania.  (*See* Dkt. 301, Ex. 34.)

### 2.    Mony Neth

Mony Neth was born in Cambodia in 1975 and fled the Khmer Rouge with his family when he was a child.  (Dkt. 28-9 [2017 Declaration of Mony Neth, hereinafter "Neth Decl."] ¶ 2.)  The family arrived in the United States in 1985, and settled in Modesto, California.  (*Id*. ¶¶ 2–4.)  Mr. Neth became a lawful permanent resident, and continues to live in Modesto today with his wife, eighteen-year-old daughter, and parents, all of whom are U.S. citizens.  (*Id*. ¶ 3.)

By his own account, Mr. Neth "got involved with the wrong crowd when [he] was younger."  (*Id.* ¶ 4.)  In 1995, he was convicted of unlawful possession of a weapon and receipt of stolen property.  (*Id*.)  Mr. Neth was sentenced to four years' imprisonment, but

was released after two and a half years.  (*Id*.)  After his release, ICE detained Mr. Neth for removal proceedings.  (*Id*. ¶ 5.)  Shortly after, ICE released Mr. Neth on bond.  (*Id*.) Mr. Neth then returned to Modesto, and in the last twenty-plus years has not been charged with any additional crime.  (*Id*.)  Instead, Mr. Neth has built a family, is gainfully employed by a solar energy company, and is an active member of his local church, where he regularly serves meals to the homeless.  (*Id*. ¶¶ 5, 12.)

In 2010, Mr. Neth got a letter asking him to turn himself in for deportation.  (*Id*. ¶ 6.)  In his words, although he had "fought [his] deportation case for over a decade," after he lost, he "knew that [he] had to respect the final decision in [his] case, so [he] turned [himself] in."  (*Id*.)  He was detained for several months, but ICE released Mr. Neth again after it was unable to get a travel document for him.  (*Id*.)

On July 28, 2017, the Stanislaus County Superior Court granted Mr. Neth a Certificate of Rehabilitation for his 1995 conviction.  (*Id*. ¶ 13; Dkt. 28-12 [Declaration of Anoop Prasad, hereinafter "Prasad Decl."] Ex. B.)  To support the finding of rehabilitation with satisfactory proof, the court and the District Attorney's office completed a full investigation and hearing.  (*Id*.)  The court found that Mr. Neth "has demonstrated by the course of conduct [his] rehabilitation and fitness to exercise all the civil and political rights of citizenship."  (*Id*.)

On October 19, 2017, ICE officers unexpectedly visited Mr. Neth's home and spoke to his mother while he was at work.  (Neth Decl. ¶ 8.)  The next morning, ICE officers stopped and arrested Mr. Neth while he was driving to work.  (*Id*. ¶ 9.)  Mr. Neth received no notice or explanation of why he was being detained.  (*Id*. ¶ 10.)  Mr. Neth's family learned he was being detained only after the fact, when an ICE officer drove Mr. Neth's car to his home and handed his wife the keys.  (Dkt. 28-7 [Declaration of Phounsavath Khamvongsa (Mr. Neth's wife), hereinafter "Khamvongsa Decl."] ¶ 13.)

On December 6, 2017, while Mr. Neth was in ICE detention, the Governor of California granted him a full and unconditional pardon, stating that since his conviction, Mr. Neth "has lived an honest and upright life, exhibited good moral character, and conducted himself as a law-abiding citizen." (Prasad Decl. Ex. A.) The pardon nullified the immigration consequences of Mr. Neth's conviction, and formed the basis of a motion to reopen and a motion for stay of removal, which Mr. Neth filed through counsel in the Board of Immigration Appeals ("BIA") on December 13, 2017. (Dkt 62-6 [Supplemental Declaration of Anoop Prasad, hereinafter "Supp. Prasad Decl."] ¶ 6.)

Mr. Neth was among a group of Petitioners scheduled to be deported on December 18, 2017, before the Court entered a temporary restraining order enjoining execution of Petitioners' removal orders. (*Id.*) Given the scheduled removal, Mr. Neth's counsel asked the BIA to process his motion for a stay on an expedited basis. (*Id.* ¶ 7.) After persistent efforts including contact with ICE and the BIA, counsel received notice on December 21, 2017 that the BIA granted a stay. (*Id.* ¶¶ 7–11.) On December 22, 2017, ICE released Mr. Neth from detention on an order of supervision pending the outcome of his removal proceedings. (Dkt. 93-2 ¶ 3.) The BIA granted Mr. Neth's motion to reopen on April 17, 2018, and an immigration judge terminated his removal proceedings on August 28, 2018. (Shultz Decl. ¶ 19; Dkt. 316 at 17.)

### 3.    Other Class Members

Petitioners Chhoeun and Neth exemplify the experiences of many other class members. They, like most class members, fled Cambodia when they were small children to escape the Khmer Rouge's campaign of mass murder and torture, and the United States is the only home they have ever known.[2] They are subject to removal orders based

---

[2] (*See, e.g.*, Dkt. 28-8 [Declaration of Rottanak Kong, hereinafter "Kong Decl."] ¶ 2 ["My family fled Cambodia because of all the killings when I was just a few months old."]; Dkt. 92-30 [Declaration of

on crimes they committed over a decade ago, when they were in their teens and twenties.[3]

Since their removal orders were issued, Petitioners were released from custody and have

seized the opportunity to become productive members of their communities.[4]  Almost all

are lawful permanent residents and have parents, siblings, spouses, and children who are

U.S. citizens.[5]  These family members rely on class members for financial and emotional

support.[6]

**B. Procedural History**

In 2017, after years of difficulty repatriating people from the U.S. to Cambodia, the

Cambodian government told ICE that it would consider relaxing previous requirements

that had caused some of the difficulty.  (*See* Dkt. 60-1 [Declaration of John A. Schultz,

Jr., Deputy Assistant Director for ICE's Removal Management Division] ¶ 13.)

Sowath Thong, hereinafter "Thong Decl."] ¶¶ 2–3, 6 ["I have no memories of living (in Cambodia)."];
Dkt. 92-5 [Declaration of Sok Chhay, hereinafter "Chhay Decl."] ¶¶ 2–4 [describing how his father died
of starvation during the Khmer Rouge regime while his mother was pregnant with him, and how his
family went to a Thai refugee camp when he was four years old; Dkt. 185-12 [Declaration of Sene Sem,
hereinafter "Sem Decl."] ¶ 2 ["My first memories are from the refugee camp in Thailand."]; Dkt. 251-1,
Ex. 31 [Declaration of Sear Un, hereinafter "Un Decl."] ¶ 3 [describing how his parents fled the Khmer
Rouge and almost had to leave him behind because he was crying from hunger, but a woman gave him a
little rice so that he would stop crying for long enough to sneak by soldiers]); *see* Dkt. 185-10
[Declaration of Chhay Kim, hereinafter "Kim Decl."] ¶¶ 1, 13 [describing how he was born in a refugee
camp in Thailand because his family fled the Khmer Rouge before he was born and has never even been
to Cambodia].)

[3] (*See, e.g.*, Kong Decl. ¶ 5 [crimes in 2003 and 2004 as a teen]; Thong Decl. ¶¶ 7–10 [crime in 1998 at
age 18]; Dkt. 28-18 [Declaration of Sareang Ye, hereinafter "Ye Decl."] ¶ 4 [crime in early 1990's as a
teen]; Chhay Decl. ¶¶ 5–6 [crime in 1993 as a teen]; Sem Decl. ¶ 6 [crime in 1990 at age 18]; Kim Decl.
¶¶ 5–7 [crime in 1999 at age 24]; Un Decl. ¶ 13 [conviction in 1998 at age 20].)

[4] (*See, e.g.*, Thong Decl. ¶ 15; Ye Decl. ¶¶ 5, 7; Chhay Decl. ¶¶ 10–12; Kim Decl. ¶ 8; Un Decl. ¶ 22.)

[5] (*See, e.g.*, Kong Decl. ¶¶ 5, 12; Thong Decl. ¶¶ 4, 13, 16; Ye Decl. ¶¶ 2, 5; Chhay Decl. ¶ 11; Kim
Decl. ¶ 9; Un Decl. ¶ 5.)

[6] (*See, e.g.*, Kong Decl. ¶ 12; Khamvongsa Decl. ¶¶ 5, 14 [describing how Mr. Neth helps pay the bills
and helps his daughter with his homework]; Ye Decl. ¶¶ 3, 8; Thong Decl. ¶ 31 [describing how he takes
his elderly mother to doctors' appointments and does housework for her]; Chhay Decl. ¶ 17 [describing
how he pays child support]; Kim Decl. ¶¶ 9–10 [describing how he takes his children to school, sports
practices and games, and doctor appointments]; Un Decl. ¶¶ 22–25 [explaining how his wife is
expecting their third child sometime this year, and how his wife has various health issues that preclude
her from working, meaning Un's detention makes it hard for the family to make ends meet].)

Accordingly, ICE began conducting raids to re-detain Cambodian nationals who had been released so Cambodian authorities could interview them for possible removal to Cambodia.  (*Id.* ¶¶ 14–15.)  In October 2017, ICE revoked the release of 89 individuals with final removal orders, including Mr. Chhoeun and Mr. Neth, to consider them for removal.  (*Id.* ¶ 15; *see* 2017 Chhoeun Decl. ¶ 13; Neth Decl. ¶¶ 8–10.)  Some were detained during regularly scheduled ICE check-ins, while others received phone calls or letters from ICE ordering them to report early without explanation and were detained upon complying, and still others were detained after being pulled over while they drove to work.  (*See* 2017 Chhoeun Decl. ¶ 13; Chhoeun Depo. at 42–43; Neth Decl. ¶ 8; Thong Decl. ¶ 19; Ye Decl. ¶ 6.)

On October 27, 2017, Petitioners Nak Kim Chhoeun and Mony Neth filed this class action challenging the government's policy of rounding up and placing in immigration detention Cambodian nationals who had been released and living peaceably for years or decades without notice and without an opportunity to challenge their removal.  (Dkt. 1 [Complaint]; Dkt. 27 [First Amended Habeas Corpus Petition and Complaint].)  On December 14, 2017, the Court granted a temporary restraining order enjoining the government from executing Petitioners' final removal orders.  (Dkt. 32.)  On January 25, 2018, the Court granted a preliminary injunction enjoining the government from executing those orders until February 5, 2018, and for any Petitioner who filed a motion to reopen before that date, enjoining the government from executing the removal order until seven days after BIA denial of the motion to reopen.  (Dkt. 75.)

The government conducted a second set of raids in spring 2018, detaining—again without notice—another 30 Cambodians, many of whom are class members.  (Mot. at 7.)  On August 14, 2018, the Court certified a class in this case consisting of:

> All Cambodian nationals in the United States who received final orders of deportation or removal, and were

subsequently released from ICE custody, and have not subsequently violated any criminal laws or conditions of their release, and have been or may be re-detained for removal by ICE.

(Dkt. 149 at 16.)

In fall 2018, the government conducted another set of raids, detaining without notice approximately 50 Cambodians for interviews that would help determine whether they would be deported.  (Dkt. 185-8 [Declaration of Anoop Prasad] ¶ 3.)  Those detained included Chhay Kim, who had reported to ICE consistently for 18 years and whose wife was less than 2 months away from giving birth to their fifth child, (Kim Decl. ¶¶ 9, 11, 12), and Sene Sem, who was re-detained without warning in his own home, and in front of his 10-year-old daughter and mother-in-law, (Sem Decl. ¶ 25.).

On December 17, 2018, a Cambodian government official told Petitioners' counsel about a U.S. diplomatic note inviting Cambodian officials to conduct interviews of 100 Cambodian nationals from January 28, 2019 to February 8, 2019.  (Dkt. 185 at 6; Dkt. 185-5 [Declaration of Kevin Chun Hoi Lo] ¶¶ 3–5.)  Petitioners' counsel understood this to mean that the government was planning to carry out more large-scale raids to re-detain up to 100 class members beginning in early January 2019, since raids are conducted before interviews so detainees can be transported to their interview location.  (*Id.*)

Concerned about the possibility of yet another raid, Petitioners contacted the government on December 19, 2018 to determine whether the government would provide notice to class members before re-detaining them.  (Dkt. 185-9 [Declaration of Jingni Zhao] ¶ 2.)  When the government responded that it would not provide notice without a court order, Petitioners stated they would seek emergency relief in this Court.  (*Id.* ¶ 3.)  On January 3, 2019, the Court issued a temporary restraining order enjoining the

government from re-detaining any class member unless the government first provided written notice at least 14 days before detention. (Dkt. 190.)  The Court also issued an order to show cause why a preliminary injunction should not issue (*id.*), but the parties instead stipulated to filing these cross-motions for summary judgment on the issue raised in the order to show cause:  whether the Constitution requires the government to provide written notice to class members before detention. (Dkts. 206–207.)  The parties further stipulated that the temporary restraining order regarding notice would remain in effect up to and including the hearing on those cross-motions. (*Id.*)

### C. Legal Developments Since Petitioners Were Released

According to Petitioners, there have been fundamental changes in immigration law and Petitioners' personal circumstances since the original removal orders were issued. (Mot. at 5–6; Dkt. 306 at 4.)  Petitioners contend that these changes provide viable avenues to reopen Petitioners' cases and challenge their removal orders. (*Id.*)

One relevant change is the Supreme Court's decision in *Judulang v. Holder*, 565 U.S. 42 (2011).  In that case, the Court determined that the BIA's then-existing practice for determining whether an alien was eligible to seek relief from deportation from the Attorney General was "arbitrary and capricious" under the Administrative Procedure Act. *Id.* at 52–53.  The BIA's approach, known as the "comparable-grounds" rule, examined whether the charged deportation ground had a close analogue in the Immigration and Nationality Act's list of exclusion grounds.  If it did, the alien could seek discretionary relief.  But if the deportation ground covered different, more, or fewer offenses than any exclusion ground, the alien was ineligible for relief, even if the alien's particular offense fell within an exclusion ground.  For example, Judulang's deportation ground was that he committed an "aggravated felony" involving a "crime of violence," but the "crime of violence" deportation ground included offenses (including simple assault, minor

burglary, and unauthorized use of a vehicle) not found in the exclusion ground for a "crime involving moral turpitude," meaning there was not a sufficient match, and Judulang was not eligible for relief.  The Court explained that the BIA "failed to exercise its discretion in a reasoned manner" because it "hing[ed] a deportable alien's eligibility for discretionary relief on the chance correspondence between statutory categories—a matter irrelevant to the alien's fitness to reside in this country" or the purposes of the immigration laws.  *Id.*  *Judulang* has afforded some aliens a previously-unavailable basis to reopen their immigration proceedings.  (Mot. at 5); *see, e.g., Bonilla v. Lynch*, 840 F.3d 575, 581 (9th Cir. 2016) (regarding a supplement to a motion to reopen filed based on "the change of law announced in *Judulang*").

Another change is *Johnson v. United States*, where the Supreme Court held that the "residual clause" of the Armed Career Criminal Act is unconstitutionally vague under the Fifth Amendment.  135 S. Ct. 2551, 2557 (2015).  The "residual clause" defined a "violent felony" to include any felony that "involves conduct that presents a serious potential risk of physical injury to another."  *Id.* at 2555 (citing 18 U.S.C. § 924(e)(2)(B)); (Mot. at 5–6).  The Court reasoned that two aspects of this definition, taken together, made it unconstitutionally vague:  there was "grave uncertainty" as to (1) how to estimate the risk posed by a crime because the Court's test required courts to assess the risk using a "judicially imagined 'ordinary case'" of a crime rather than the real-world facts or statutory elements, and (2) how much risk it takes for a crime to qualify as a violent felony, especially when the test involved applying the "serious potential risk" standard to the "judge-imagined abstraction" of the "ordinary case."  *Id.* at 2557.  The Court found that these uncertainties "produce[d] more unpredictability and arbitrariness than the Due Process Clause tolerates."  *Id.* at 2558.  If a class member was convicted under this clause, *Johnson* may provide grounds for relief from his or her removal order.

A similar legal change occurred in *Sessions v. Dimaya*, where the Supreme Court applied *Johnson* to invalidate as unconstitutionally vague the residual clause of the federal criminal code's definition of "crime of violence."  138 S. Ct. 1204, 1210 (2018). *Dimaya* may be particularly important to Petitioners here because the "crime of violence" definition that case invalidated is often used as a cross-reference to find that an alien has been convicted of an "aggravated felony" under the Immigration and Nationality Act, making the alien deportable and ineligible for cancellation of removal.  If a class member was found to have been convicted of an "aggravated felony" using the residual clause of the federal criminal code's crime of violence definition, *Dimaya* may provide the class member grounds for relief.  (*See, e.g.*, Un Decl. ¶ 13 [class member who may no longer be deportable under *Dimaya*].)

Still other Petitioners may have grounds to vacate their decades-old guilty pleas and the underlying removal orders based on *Padilla v. Kentucky*, where the Supreme Court held that the Sixth Amendment requires attorneys to advise criminal defendants of the deportation consequences of guilty pleas.  559 U.S. 356, 360 (2010).

## III.   LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 325.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law.  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 249.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor.  *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).  The court does not make credibility determinations, nor does it weigh conflicting evidence.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).  But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment.  *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  The material the parties present must be the type that would be admissible in evidence.  Fed. R. Civ. P. 56(c).

## IV.   DISCUSSION

The question presented in these motions is whether the Constitution requires notice before an immigrant who is subject to a final removal order, but has been released despite that removal order (often for years or decades) and committed no further crimes, may be re-detained for purposes of removal.  "[T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citations and quotations omitted).  The "touchstone" of due process is protecting people against arbitrary government action, whether from "denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective."  *Id.* at 845–46.  The Due Process Clause "protect[s] every

person within the nation's borders"—including those "whose presence in this country is unlawful, involuntary, or transitory." *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014) (en banc); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").  It is "well established that aliens facing deportation from this country are entitled to due process rights." *Walters v. Reno*, 145 F.3d 1032, 1037 (9th Cir. 1998).

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333 (citations and quotations omitted).  "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.  Due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334 (citations and quotations omitted).

To determine what procedural protections due process requires, courts balance three factors: "(1) the private interest affected; (2) the risk of erroneous deprivation through the procedures used, and the value of additional safeguards; and (3) the government's interest, including the burdens of additional procedural requirements." *Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015) (citing *Mathews*, 424 U.S. at 335).  Here, then, the Court weighs Petitioners' liberty interest in remaining in the United States against the risk of erroneous deprivation of that liberty interest without notice, the value of notice, and the government's interest in removing Petitioners without notice, including the burdens of that notice.  *See id.*

## A. The Private Interest Affected

The private interest affected here cannot be overstated:  it is the liberty interest that the Constitution guarantees will not be deprived without due process of law.  Though the Supreme Court "has not attempted to define with exactness the liberty . . . guaranteed" in the Fifth and Fourteenth Amendments, it means "[w]ithout doubt" not merely freedom from physical restraint, but also the right to work, learn, marry, establish a home, raise children, and all of the privileges "essential to the orderly pursuit of happiness."  *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (citing fourteen cases).  The Supreme Court has further long recognized that removal places "the liberty of an individual . . . at stake" because it "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom."  *Bridges v. Wixon*, 326 U.S. 135, 154 (1945).  "Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness."  *Id.*

Petitioners have a strong liberty interest in remaining in this country to live, work, and raise families.[7]  *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1068–69 (9th Cir. 1995) ("Aliens who have resided for more than a decade in this country . . . have a strong liberty interest in remaining in their homes."); *see Bridges*, 326 U.S. at 154 (removal "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom").  Many Petitioners have been living in the

---

[7] The government has argued that the Court lacks jurisdiction because it cannot review the decision to execute a removal order.  (*See, e.g.*, Dkt. 275-2 [seeking leave to file overlong cross-motion to assert this argument].)  However, as the Court has explained, Petitioners do not challenge here the government's decision to remove them, but rather assert a due process right to notice before re-detention so they may, among other things, challenge the underlying validity of their removal orders.  (*See* Dkt. 74 at 18.)  Re-detention and removal here are inextricably intertwined because the purpose of re-detention is to interview Petitioners and prepare them for removal.  (*See* Dkt. 119 [March 26, 2018 Hrg. Tr.] at 9.)  For similar reasons, the Court finds unpersuasive the government's arguments that Petitioners are "essentially seeking that their final orders of removal be cancelled and that they be allowed to remain indefinitely in the United States" or "covertly asserting a substantive due process challenge to the execution of their removal orders."  (Cross Mot. at 28; Dkt. 316 at 6.)

United States since they were small children, and have remained in this country for decades after they were ordered removed to Cambodia.  They have been raised in our communities, contributed to those same communities through gainful and productive employment, and raised families of their own.  For Petitioners, being removed to Cambodia means starting their lives over in a country they have never really known, separated from their loved ones.

The government responds that Petitioners' liberty interest is weak, because Petitioners "have been allowed to remain in the United States" only "on borrowed time," and "[t]he simple fact that the United States was unable to enforce their removal orders for any period" was only "as a result of the Cambodian government's intransigence in allowing their timely repatriation" and "does not create a private interest significant enough to warrant extra time to prepare motions to reopen or wrap up their affairs." (Cross Mot. at 26, 29.)  But this argument flatly ignores the indisputably strong ties to this country Petitioners have developed, and the meaningful investments they have made. Petitioners were initially ordered removed to Cambodia years, sometimes decades ago. Years ago, the government was unable to carry out the removals, and released them from custody to live at large in their communities.  Petitioners have caused no problems in the intervening years, and indeed have remained in the United States and contributed productively.  That Petitioners invested in and became productive members of United States communities *notwithstanding* their removal orders is to be commended.  Because they did so, instead of wallowing in limbo while waiting to be removed, they made our country better—and deepened their interest in remaining here.  For the government to now deny Petitioners' strong ties and commitment to this country is not only unpersuasive, but also deeply troubling.

The government further argues that "Petitioners have had an opportunity to personally prepare their affairs" and challenge their removal orders or underlying

convictions "every day since their removal orders became final, and certainly every day since this case was filed two years ago."  (Cross Mot. at 27; Dkt. 316 at 11.)  Again, the government ignores reality.  To expect Petitioners to—*every day* for *decades*—say goodbye to their families as they leave the house for work with the idea in mind that today could be the day they never return home, is unthinkable.  To expect Petitioners to—*every day* for *decades*— tell their bosses that that day may be their last day working, is absurd.  To expect Petitioners to—*every day* for *decades*—arrange alternate arrangements for their children to be picked up from school, for their cars and other personal effects to be picked up from wherever they are detained, and for their bills to be paid going forward, in case they are detained for removal that day, is heartless.  Even to expect Petitioners to incur the substantial burdens involved in finding and hiring counsel to consistently monitor new law (which could not have been raised in earlier removal proceedings) and file continuous motions to reopen, is unreasonable.[8]

The government further argues that although Petitioners had due process rights during removal proceedings, they have now "exhausted all due process" rights they had since they "are now subject to valid, enforceable final removal orders."  (Cross Mot. at 28; Dkt. 316 at 10–11.)  Accepting the government's position would mean that due process does not apply after issuance of a final removal order.  This is not the law.  For example, the Ninth Circuit has found a due process violation where the BIA summarily denied an alien's request that it reconsider its previous refusal to reopen removal proceedings.  *See Yeghiazaryan v. Gonzales*, 439 F.3d 994, 998 (9th Cir. 2006).  It

---

[8] (*See, e.g.*, Supp. Prasad Decl. ¶ 17 [explaining that class-members are largely low-income and unable to afford private counsel, and that access to legal services for immigrants in detention is "limited to non-existent in large parts of the country"]; Thong Decl. ¶ 33 ["I had never heard of a motion to reopen. Money has always been tight, and there are not many immigration lawyers that serve my community."]; Kim Decl. ¶ 14 ["I have never had enough money saved up to hire a lawyer to look into my immigration case . . . I have always been completely focused on my biggest responsibility: paying the bills and supporting my family."]; Dkt. 251-1, Ex. 8 [Transcript of Deposition of Tin Thanh Nguyen] at 144 [estimating the cost of a motion to reopen to be $10,000-$15,000]; Khamvongsa Decl. ¶ 9 [estimating that she and Mr. Neth have spent about $25,000 on immigration lawyers].)

follows that immigrants have due process rights after final removal orders issue, and indeed even after a motion to reopen is denied.  *See also United States v. Raya-Vaca*, 771 F.3d 1195, 1198, 1202–03 (9th Cir. 2014) (concluding that even during expedited removal proceedings after the defendant reentered after prior removal, a defendant had a due process right to notice of the charge and an opportunity to respond).

In sum, the Court finds that the private liberty interest Petitioners seek to protect is compelling.

**B. The Risk of Erroneous Deprivation and Value of Safeguards**

The Court next considers the risk of erroneously depriving Petitioners of their weighty liberty interest through the procedures currently used (no notice at all), and the value of additional safeguards (notice).  *Mathews*, 424 U.S. at 335.  As the Court explained in granting the January 2018 preliminary injunction, exceptional circumstances here, including that Petitioners' removal orders were dormant for years or decades, that Petitioners have been detained without notice, and the conditions of detention, create a high risk of erroneous deprivation, and the value of additional safeguards is high.  (Dkt. 74 at 20–22.)

Before the Court issued its January 2018 preliminary injunction, the government detained Petitioners without notice.  Petitioners therefore had no opportunity to contact counsel, evaluate the latest legal developments, or gather documents relating to their immigration and conviction histories necessary to file motions to reopen.  (*See, e.g.*, Prasad Decl. ¶ 5 ["None of the class members in detention had access to immigration or criminal court records.  Most did not remember critical details about their immigration court or criminal proceedings often from decades ago."]; *id.* ¶¶ 4–11 [describing how difficult it is for attorneys to reconstruct files, how filing motions to reopen without such

records can result in ineffective assistance of counsel, and how FOIA requests are not sufficient to get the records].)  Once in detention, Petitioners had very restricted access to attorneys and documents.  (*See* Dkt. 251-1, Ex. 6 [Transcript of Deposition of Kevin Chun Hoi Lo]; Prasad Decl. ¶¶ 4–5.)  Petitioners were also moved between detention facilities around the country frequently, making it difficult to keep in contact with their attorneys.  (Supp. Prasad Decl. ¶ 13.)  Without pre-detention notice, then, the risk of erroneous deprivation, including by decreasing the possibility of obtaining full and accurate information for use in a motion to reopen, increases significantly.

The results of the motions to reopen that some Petitioners were able to file despite these many obstacles highlight this risk.  For example, Mr. Neth, who was detained without notice in October 2017 on his drive to work, was able with the help of his family to contact counsel and vacate his removal order while in custody.  But he came dangerously close to erroneous removal.  (Mot. at 18–19.)  According to Mr. Neth's counsel, Mr. Neth was scheduled to be deported on a December 18, 2017 flight, and he may have been on the flight but for the Court's December 14, 2017 temporary restraining order.  (*See* Supp. Prasad Decl. ¶ 7.)  Even though Mr. Neth's counsel acted expeditiously to request a stay of Neth's removal—a request founded on the extremely persuasive evidence of a gubernatorial pardon—he did not receive notice of a stay until December 21, 2017, after the scheduled deportation.  (*Id.* ¶ 11.)  The BIA then granted his motion to reopen on April 17, 2018, and an immigration judge terminated his removal proceedings on August 28, 2018.[9]  (Shultz Decl. ¶ 19; Dkt. 316 at 16.)  Mr. Neth's experience reveals that even where Petitioners are able to quickly file motions to reopen and request discretionary stays of removal, the haste with which the government seeks to remove them creates a high risk of erroneous liberty deprivations.

---

[9] Mr. Neth is not the only class member whose motion to reopen was granted.  (*See, e.g.*, Dkt. 147-1 [describing two successful motions to reopen by putative class members].)

The government argues that existing administrative procedures available to those seeking to challenge their removability "are more than sufficient to guard against the risk of erroneous deportation." (Cross Mot. at 14–16.) The government is wrong. The existing procedures on which the government relies permit discretionary stays of removal where "immediate removal is not practicable or proper" or where the alien is needed to testify in a criminal prosecution. 8 U.S.C. § 1231(c)(2). These procedures do not consider the possibility that an alien may have valid grounds for a motion to reopen. (*See* Dkt. 306 at 9–10.) Mr. Neth's experience shows why existing procedures are not enough. Even though Mr. Neth had been pardoned, the process of obtaining an administrative stay required "an enormous amount of effort" from counsel, and even then, it is not clear from the record whether the stay he secured was in effect at the time Mr. Neth was scheduled to be deported. (*See* Supp. Prasad Decl. ¶ 12.) Even assuming Mr. Neth successfully obtained a stay in time to prevent his scheduled December 18, 2017 deportation, which it does not appear he did (*see* Dkt. 316 at 17), his "situation is extremely uncommon"—he "was able to obtain a stay of removal by sheer chance that counsel was aware of his deportation date and possibly because of closer scrutiny to the process because of Mr. Neth's role as a class representative." (Supp. Prasad Decl. ¶ 12.) At bottom, the existing procedures are discretionary, and the dictates of procedural due process cannot be left to the discretion of the executive branch.

At the hearing, the government focused on its authority to re-detain class members where there is a significant likelihood of removal in the reasonably foreseeable future. *See* 8 C.F.R. § 241.13; *Zadvydas*, 533 U.S. at 701. It argued that giving notice will not change the government's decision to re-detain a class member for removal because by the time the government gives notice, it has already determined that there is a significant likelihood of removal in the reasonably foreseeable future, and re-detention is thus nearly certain. But even if notice does not change the decision to re-detain the class member, notice still provides great value, including because it provides the class member an

opportunity to contact an attorney, gather any documents they have, make FOIA requests for other documents, say goodbye to their families and loved ones, and wrap up their affairs, including ensuring adequate childcare and notifying their employers.

The Court concludes that the risk of erroneous removal and the value of the additional safeguard of notice are both high.

### C. The Burden on the Government and the Public Interest

Finally, the fiscal and administrative burdens to the government of providing notice before re-detaining Petitioners is minimal, and the public interest against giving notice is also low. *See Mathews*, 424 U.S. at 335, 348 ("the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed").

The government argues that three interests outweigh the benefit of notice before re-detention. None is persuasive. First, the government points to the public interest in the "prompt execution of removal orders." (Cross Mot. at 30–31.) That train has left. The government waited years or decades to execute these removal orders, allowing Petitioners to develop deep ties to this country by raising families and working. To now argue that the government cannot wait fourteen additional days to execute those removal orders is laughable, and certainly does not weigh in favor of denying Petitioners their due process rights.

Second, the government argues notice "create[s] a burden on the ICE deportation officers who ha[ve] to gather the information and prepare the notices," taking "officers away from managing their other responsibilities." (*Id.* at 31.) However, there is no evidence that notice, which the government has been providing since the Court's January

2019 temporary restraining order, creates more than a minimal burden on the
government.  (*See* Dkt. 191 at 4.)  The mandated notice is a one-page form that includes a
date, time, and location to appear, which the government sends with the class member's
underlying criminal conviction records, notice to appear in immigration court, and order
of removal.  (*E.g.*, Dkt. 301, Ex. 24; *see* Mot. at 22.)  The government does not genuinely
dispute that the process of compiling notice is relatively simple, especially since all of the
documents attached to the notice are in the immigrant's A-File, and by the time notice is
given, the government has already gathered the documents for other purposes, including
to give to the Cambodian government for interviews.  (*See* Dkt. 250-1 ¶ 5 [describing the
tasks required]; Dkt. 300 [arguing that "the addition of any task, regardless of whether the
task is ministerial, does not mean that the task does not impose a material administrative
or fiscal burden" and focusing on the fact that any time ICE officers spend giving notice
is time they could have spent on their other duties]; Dkt. 306 at 16.)

Finally, the government argues that giving notice before re-detention creates a
"very high rate of absconsions."  (Cross Mot. at 32.)  Specifically, the government states
that of the 56 class members who were served with notice under this Court's temporary
restraining order, 30 reported for revocation of release, and 26 did not.  (Cross Mot. at
32.)  Accordingly, the government calculates a 46% absconscion rate.  (*Id.*)  The Court
takes this contention seriously.  The Court has no tolerance or sympathy for class
members who abscond after years of regularly checking in with ICE once they receive
notice that they must appear for travel document interviews.

However, the government has not provided reliable evidence to support its claimed
46% absconscion rate.  Indeed, as Petitioners point out, for some people who the
government claims absconded, the government has no evidence that it mailed notice in
the first place.  (Dkt. 306 at 19–20.)  For example, Petitioners asked the government to
produce all documents showing the government's effort to provide notice to the people

the government asserts absconded.  (Dkt. 309-1 [Supplemental Declaration of Sean Commons, hereinafter "Commons Decl."], Ex. 21 [Respondents' Objections and Responses to Petitioners' Requests for Production Number 43 and 44] at 3.)  The government responded that it searched, but found no documents evidencing notice for *six* of the alleged absconders.  (*Id.* at 4; Commons Decl. Ex. 22 at 4.)

Compounding the unreliability of the government's statistics is the fact that there is evidence that some notices went to out-of-date addresses where the class member had given the government a new address.  (Dkt. 306 at 19 [collecting evidence].)  There is also evidence that some people the government says absconded are not class members at all, because they were convicted of new crimes or violated their orders of supervision. (Dkt. 306 at 20–21.)

As icing on the cake, some people the government states absconded actually reached out to the government themselves.  For example, one class member was served with a notice stating his release was revoked and he was instructed to report to ICE.  The notice stated, "If you are unable to [keep this appointment], state your reason, sign below, and return this letter to the office at once."  (Dkt 311-1, Ex. 30.)  The class member wrote: "I deeply apologize, I am unable to report on 3-20-2019, due to personal reason, taking care of a dying extremely critically ill family member.  Please delay and postpone my check in and thank you."  (*Id.*)  The class member then reported voluntarily at a later date, was detained, filed a successful motion to reopen, and accordingly released again.  Yet this class member is on the list of people who absconded.  (*Id.*; Dkt. 306 at 20.)

Although the Court does not believe the government's 46% absconscion rate is reliable, the Court is troubled that some number of class members may have absconded. Particularly upsetting is a letter the government received from one person in response to the notice stating, "I am not showing up and i am not going back to Cambodia. Fuck you

U.S. immigration and customs and enforcement. While this letter arriving at your office i
am thousands miles away from you." (Dkt. 301, Ex. 26.) This response is totally
unacceptable. This person should be re-detained and removed without any notice.
Indeed, she has now violated the conditions of her release and is excluded from the class.
But the disappointing behavior of one person or a handful of others does not justify the
government withholding notice that is constitutionally due to hundreds of class members
who for decades have been peaceful, productive, and law-abiding members of their
communities.

Given the significance of the liberty interest affected, the serious risk of erroneous
deprivation of that extremely important interest, and the low administrative and fiscal
burden of giving notice, the Court finds that even some increase in absconscions is
tolerable under the *Mathews* balancing test. Overall, the fiscal and administrative
burdens that notice imposes on the government—including the small burden of putting
together the notice documents, the short delay before the government may remove
Petitioners, and the occasional burdens associated with absconsion—are minimal, and do
not warrant a denial of Petitioners' procedural due process rights.

**D. Whether Notice is Necessary to Comport with Due Process**

For all of these reasons, the Court concludes that to protect Petitioners' due process
rights, the government must give them notice before re-detaining them for purposes of
removal. The extraordinary circumstances of this case—including the long-dormant
removal orders, changes in the law and in Petitioners' lives, the sudden and unexpected
threat of removal, and the barriers to accessing attorneys and documents while in
detention—have undermined Petitioners' ability to avail themselves of the administrative
procedures in place to protect them from erroneous removals. Petitioners must be given
notice so that they may have adequate time and opportunity to contact attorneys and

access the system that has been constructed to prevent erroneous removals—a system that includes the thorough exhaustion of an administrative process and judicial review by the appropriate court of appeals.  The added safeguard of notice also provides the additional value of allowing Petitioners to say goodbye to their families, and wrap up their affairs, including ensuring adequate care for their loved ones and notifying their employers.

In contrast, the administrative and fiscal governmental burdens associated with notice are slight, and do not warrant denying Petitioners notice.  Although the government's contentions regarding absconscion are concerning, the evidence before the Court does not indicate that this serious issue outweighs the compelling private interest and the significant risk of erroneous deprivation of liberty.

Accordingly, **IT IS HEREBY ORDERED** that the Government is enjoined from re-detaining any class member unless the Government first provides written notice consistent with this Court's January 3, 2019 temporary restraining order.  The parties are **ORDERED** to file within fourteen days a proposed permanent injunction consistent with this order.

# V.   CONCLUSION

For the foregoing reasons, Petitioners' motion for summary judgment is **GRANTED**, and Respondents' cross-motion for summary judgment is **DENIED**.

DATED:     March 4, 2020

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE